## LAU HU YUEN v. UNITED STATES.*

### No. 8116.

Circuit Court of Appeals, Ninth Circuit.

Aug. 13, 1936.

E. J. Botts, of Honolulu, T. H., and Herbert Chamberlin, of San Francisco, Cal., for appellant.

Ingram M. Stainback, U. S. Atty., Samuel Shapiro, Sp. Asst. U. S. Atty., and Ernest J. Hover, U. S. Dept. of Labor, Immigration and Naturalization Service, all of Honolulu, T. H., and H. H. McPike, U. S. Atty., and A. J. Zirpoli, Asst. U. S. Atty., both of San Francisco, Cal., for the United States.

Before WILBUR, GARRECHT, and DENMAN, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal from a judgment that appellant, defendant below, is "a person of Chinese descent and not a citizen of the United States of America and is now within the territory of Hawaii, United States of America, and that the said Lau Hu Yuen, alias Lau Chock Wah, has no lawful right to remain in the United States of America; that the defendant be deported to China from the United States of America from the Port of Honolulu in the Territory of Hawaii; and the defendant is hereby committed to the custody of the United States Marshal for the District of Hawaii to carry into effect this judgment of deportation."

*Rehearing denied Oct. 19, 1936.

Appellant in 1923 had entered the United States after a proceeding before the Department of Labor, Immigration Service, in which a Board of Special Inquiry had found that appellant was born in Hawaii, and was hence a citizen of the United States. He has since resided in the Hawaiian Islands.

The United States introduced in the trial below the record of that proceeding, including the evidence then adduced. It appeared that appellant had two sons, and the uncontradicted evidence later adduced in the trial showed the two sons still living. During the 13 years from 1923 to the trial in 1935, appellant, in his status of a citizen, had advanced from a farm laborer to the owner of a vegetable shop.

The question presented at the trial was whether the status of the father, as an American citizen, and hence, necessarily, of the two sons, so established before the Board of Inquiry of the Immigration Service, was established upon false or fraudulent representations to these Bureau officials.

The proceedings before that Board were conducted by the Bureau's immigration inspector; the appellant applicant declined to produce counsel and he and his four witnesses testified under the interrogation of the Inspector. The testimony showed that appellant was born in Honolulu in 1897, and was taken by his father from Hawaii to China in the year 1899, and that appellant remained in China until 1923.

The hearing before the Board was had on April 28, 1923; that is, over 23 years after appellant had left Honolulu at two years of age. It is hence apparent that appellant's testimony concerning his Hawaiian birth must necessarily rest on what was told him by other persons. It is hearsay of the most remote character. His effective testimony was that he had lived in China with the man who had told him he was his father. The testimony supporting his Hawaiian birth, and hence his citizenship and that of his two children, primarily rests on other witnesses there testifying.

Lau Kwock Leong testified that he was 58 years of age; that he was in Honolulu in 1897, the year of appellant's birth, and that appellant was born in Honolulu on Beretania street near Nuuanu; that appellant was (in 1923) 26 years of age; that appellant's father, Lau Ah Chew, also called Lau Chun Ng, was a dressmaker in Hono-

lulu; that appellant's mother was Tom She; that he had seen appellant in Honolulu about two or three months after he was born; that appellant's father Lau Chew was then (1923) living in China, and was a rice planter; that Tom She was dead; that appellant's father took appellant, then a child, to China on the steamship Doric in 1899.

Lau Kwai's testimony was that he was 47 years of age; that appellant was born in Honolulu on Beretania street near Nuuanu; that he saw appellant a week after he was born; that appellant's father was Ah Chew (Ah meaning Mr.); his mother was Tom She; that appellant's father was living in China; and that his mother was dead. That the father while in Honolulu was a dressmaker, and that the witness in 1899 sailed with the father when he took appellant, then a two year old child, on the steamship Doric to China. At the trial below the passenger list of the Doric for that voyage was introduced and showed the name "Ah Chew" and "child."

Wong Pan Hin testified that he came from China to Hawaii when 20 years of age; that he knew appellant's father in China as a rice planter and also the appellant, before the latter came to Honolulu, and that the father had told him that appellant was born in Hawaii; and that his wife, Tom She, the mother of appellant, died in Hawaii.

The Bureau also presented to the Board in the 1923 hearing, the record of the death in June, 1899, of one Tom She, who lived at *Smith* and Beretania street. The testimony below is that this Chinese feminine name, when written in English, is idem sonans, whether written Tom or Tam She. At the trial below the death records showed the death of another female Chinese Tam See, who died in June, 1898. Both women lived in the Fourth ward, the Chinese district of Honolulu.

It further appears that two of these witnesses before the Immigration Bureau in 1923, and whose testimony before the Bureau was introduced in the trial below, were in Honolulu at the time of the latter trial; that they were interviewed by an Immigration Inspector; and that they were not called as witnesses to show that they were mistaken in their former testimony that appellant was born in Honolulu. If they had been offered as government witnesses to prove they had committed such error at the 1923 hearing, and when pro-

duced denied what they had told the inspector in 1935, the government would have been entitled to impeach them on the ground of surprise. The government could then introduce their statements of their admissions to the Inspector that their 1923 evidence was in error.

The introduction of the record of their testimony before the Board of Inquiry, inferior evidence to what they might have testified in the trial in 1935, warrants the inference that had they testified they would have even more certainly and definitely established appellant's birth in Honolulu and hence his citizenship, and along with it that of his two sons.

Whether or not such an inference is permissible, the court below is in manifest error in drawing the opposite inference because *appellant* did not produce these two witnesses. The burden was on the United States and not on him. This error is manifest from the following in the court's decision:

"It developed in the case that two of the witnesses on behalf of defendant, at the hearing in 1923, are alive and living in Honolulu. Neither was called in this case.

"This leads to the inference that if called their testimony would have been against the defendant. In Hung You Hong v. U. S., 68 F.(2d) 67, 69 (C.C.A. 9), the court stated:

" ' * * * where weaker and less satisfactory evidence is produced *by a party to whom better and more satisfactory evidence is available,* if his testimony is true it must be presumed that such testimony will be against him. As was said by the Supreme Court in Runkle v. Burham, 153 U.S. 216, 225, 14 S.Ct. 837, 841, 38 L.Ed. 694:

" ' "The doctrine that the production of weaker evidence, when stronger might have been produced, *lays the producer* open to the suspicion that the stronger evidence would have been to his prejudice was expressly adopted in the case of Clifton v. United States, 4 How. 242 (11 L.Ed. 957)." ' "

█ This is a proceeding in which the government seeks to deprive the appellant and his children of the status of citizenship established by the United States Bureau after an investigation conducted without attorney for the appellant and entirely in the control of its officials. The overturning of the decision of the Board as to the man's citizenship means his expatriation if that determination of his status is true. As said by the Supreme Court in another Chinese deportation proceeding, the deportation means the deprivation of the citizen of perhaps "all that makes life worth living." Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 495, 66 L.Ed. 938.

From the standpoint of our citizenship and of the duty of the nation to each of its citizens, however lowly his status, this is as true of this Hawaiian born son of a Chinese dressmaker, now a shopkeeper and, incidentally, of his two sons, as it is of a judge of this court. Hence in such cases we have held that on the United States falls the burden of impeaching the status of citizenship established by the Immigration Bureau's hearing, and which he has enjoyed in his 12-year residence in Honolulu. Leong Kwai Yin v. U. S. (C.C.A.) 31 F.(2d) 738, 739.

In the trial below the United States offered no evidence to refute the acknowledgment by the father of his paternity of appellant or the evidence that the father had no other child.

█ It is within the judicial knowledge of this court for the Ninth Circuit that in the 1890's the Chinese quarters of its cities were densely populated. The evidence shows that the Tam She who died in June, 1899, lived in the Fourth ward of Honolulu on Smith street between Beretania and Pauahi streets (81). The one testified to by the two witnesses before the Board as the mother of appellant lived at Beretania near Nuuanu street. Nuuanu street was back of Smith street. It is thus apparent that the two proven Tam Shes could have lived as much apart as three blocks in the Chinese quarter. In that crowded district it is not at all unlikely that the two Tam Shes may have lived on the same block and within a short distance of each other. The death records show both Tam Shes died in the Fourth ward, one in June, 1898, and one in June, 1899.

The sole testimony which is claimed to impeach the testimony of these two witnesses is that in 1923, nearly a quarter of a century after both Tam Shes had died within a year of one another, they testified that the mother of appellant died in *June, 1899*. It was proven that the 1899 Tam She was not the mother of appellant. No proof was offered that the one dying in *June, 1898*, was not his mother. The confusion of a year, though the right mother is remembered, made 25 years after, is no ground to

support the impeachment of the citizenship of her son. It would have been of no impeaching value if the two witnesses at the hearing in 1923 had been introduced and had testified that they had attempted to refresh their memories from the records and had gone no further back than the June, 1899, burial record and relied on it, without the further search which would have revealed the June, 1898, burial of the other Tam She.

The court found that appellant was not the son of the Tam She living on Nuuanu street and expressly based the finding on the testimony of her son George Hoon Leong and her daughter Jesse Leong Ho. George testified that he was present when his mother died; that she died in June, 1899, in a place known as Ahia Block on Smith street. Jesse did not testify at all as to her mother's residence. The question here is, where and to whom appellant was born, and this evidence of the two Leong children that their mother died on Smith street in 1899 does not support the impeaching burden of the United States to show that appellant was not born in 1897 to the Tam She who was then living on Nuuanu street, Honolulu, and who may well have been the Tam She dying in June, 1898.

The error into which the District Court fell is that the Board of Inquiry decided the citizenship of appellant on *his* testimony as to his mother's *death* at the hearing in 1923. The testimony of a man who left Honolulu 24 years before, at two years of age, concerning his mother's death before his departure was obviously hearsay, of inconsequent weight in the hearing before the Board. He then believed that his mother was the Tam She who died in June, 1899, and not the one who died in June, 1898. If appellant, instead of being a Chinese-descended shopkeeper, had been a Caucasian in a suit requiring proof of birth in London, whence he had been taken at two years of age, and where he returned at twenty-six, it is unlikely that any American bureau official would urge it to be an evidence of fraud or false statement that the son relied on assurances that the London records showed his mother had died there in 1899, when the second record was shown of the death, a year earlier, of another woman of the same name, who well could be his mother.

In certain communities prejudices are said to exist favoring the integrity of testimony of white persons, particularly the so-called "Nordics," against the red-skinned Indian, the yellow Chinese and Japanese, the dark-complexioned Mediterranean, and darker African. Though its reassertion be trite, we take judicial notice that neither the sense of color nor historical racial antagonisms afford criteria of integrity of the mind.

In 1904 some one procured a permit to exhume the remains of the Tam She who died in 1898. The testimony is uncontradicted that the permits are sometimes not used for years. The father in this case was a poor rice cultivator in China at the time the permit was obtained. How long it took him to save the money necessary to carry out the requirements of his religion that his wife's body should be exhumed, transported, and buried in China, does not appear. Appellant, in the hearing in 1923, stated that in 1917 his mother's body was brought to China. In 1935, at the hearing below, he added that she was buried in his father's village graveyard. The lad was then working in another place, and some months later came to his father's village and visited the grave.

The government claims that this testimony is untrue. The obvious method of proving its falsity would be to inspect the Honolulu cemetery records and see whether the permit was used, and, if so, when the body was exhumed, and, if exhumed, to inspect the Honolulu custom house and shipping records to find whether it was shipped to China in 1917. This would have thrown light on his testimony before the Board. It was the method pursued in Tom Ung Chai v. Burnett (C.C.A.), 25 F.(2d) 574, 576. The immigration official testifying below had looked up these records to verify or disprove the testimony before the Board that appellant's father in 1899 had taken him to China on the Doric. He testified he could not find appellant's father's name on the Doric's passenger list or any name that resembled it. Later the list was produced and disclosed the names "Ah Chew and child." Lucky it was that appellant did not accept the testimony of this United States official.

It is this same immigration inspector who testified as follows: "I found a record of Tom Shee that died on Beretania Street near Nuuanu Street, Honolulu, on June 19, 1899," but did not find or did not mention the record produced by another inspector in the hearing in 1923, showing

that: "Tom She, 38 died June 19, 1899, at Beretania and Smith Streets." It is not by these methods that the lack of candor in appellant is shown.

It is suggested in Leong Kwai Yin v. U. S. (C.C.A.) 31 F.(2d) 738, 739, that in 1923 there were accusations of laxity in immigration enforcement in Hawaii. If this be so, an unwarranted prejudice might arise against appellant in his established status as a citizen. The possibility of such a prejudice requires the higher diligence on the part of immigration officials in gathering the facts in a particular case. Their obligation as enforcers of the immigration laws is as mandatory to establish citizenship, if it exist, as it is to deport the alien. As was said in the Yin Case [31 F.(2d) 738, 739] of the record: "It discloses no grounds for deportation. The decision of the Board of Special Inquiry, admitting the appellant, and his certificate of identity, are in no wise impeached for either fraud or error, and, if this appellant may be deported on such a record, there is no reason why every other Chinese person admitted to the territory during the same period, because of his Hawaiian birth, may not be deported."

In determining the truth or untruth of appellant's testimony, some one, probably an American consular representative in China, should have visited the graveyard and there determined whether there was any such grave. None of these efforts to disprove appellant's testimony by direct refutation was shown to have been made. Instead, a suspicion was sought to be raised because, although the remains of the Tam She dying in 1899 were shipped to China in 1920, the order for their exhumation was made in 1917. Instead of the suggested refutation, there is only the argument that appellant might have built a false story on the knowledge, not proven, that he had heard of the 1917 permit for exhumation of the 1899 Tam She and supposed that she was shipped to China in that year. Certainly such a mere suspicion, inferior evidence to the Honolulu cemetery and shipping records and the burial grounds of the Tam She dying in 1898, cannot sustain the impeaching burden of the government.

As stated, the question is not: When did appellant's mother die and what was done with her body? The question is: Did that body when living bear the appellant as its son? His testimony is pure hearsay of the most remote character.

The testimony of the two witnesses before the Board who were in Honolulu at the time is unimpeached.

No fraud or error has been shown in the procuring of the decision of the Board of Inquiry in 1923, and appellant's status as a citizen is undisturbed. The judgment is reversed, and the District Court ordered to discharge appellant from custody.

Reversed.