## NATIONAL LABOR RELATIONS BOARD v. PACIFIC GREYHOUND LINES, Inc.

### No. 8453.

Circuit Court of Appeals, Ninth Circuit.

Sept. 19, 1939.

As Amended Sept. 29, 1939.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Ernest A. Gross and Richard A. Perkins, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Gregory A. Harrison, H. C. Lucas, J. D. Maatta, and M. B. Plant, all of San Francisco, Cal. (Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for respondent.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Petitioner, hereafter called the Board, having heretofore procured our decree confirming its order of December 18, 1936, requiring respondent, hereafter called Greyhound, to cease and desist from certain unfair labor practices, alleges in its petition that Greyhound has violated our decree and prays for the issuance of a rule requiring Greyhound to show cause why it should not be adjudicated in contempt. A rule to show cause was made and served and Greyhound responded by its motion to dismiss the Board's petition on the ground that the petition failed to state facts constituting a violation of the decree.

Since the decree of this court confirmed the cease and desist order of the Board of date December 18, 1936, the conduct of Greyhound prior to that date determines the character of the acts which were ordered to cease and from which Greyhound was to desist. Cf. National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 99 F.2d 533, 538.

The Board's order and our decree ordered Greyhound to cease and desist,

"(a) From discouraging membership in the Brotherhood of Locomotive Enginemen and Firemen, or any other labor organization of its operators, or encouraging membership in the Drivers' Association, Pacific Greyhound Lines, or any other labor organization of its operators, by discriminating against its operators in regard to hire or tenure of employment or any term or condition of employment;

"(b) From dominating or interfering with the administration of the Drivers' Association, Pacific Greyhound Lines, or with the formation or administration of any other labor organization of its operators, and from contributing financial or other support to the Drivers' Association, Pacific Greyhound Lines, or any other labor organization of its operators, except that nothing in this paragraph shall prohibit the respondent from permitting its operators to confer with it during working hours without loss of time or pay;

"(c) From in any other manner interfering with, restraining, or coercing its operators in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C.A. § 157]."

The provisions of the National Labor Relations Act[1], upon the violation of which the order to cease and desist was predicated were paragraphs (1), (2) and (3) of Section 8 of the Act, 29 U.S.C.A. § 158(1–3). Paragraphs (1) and (2) provide that it shall be an unfair labor practice for an employer:

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 [157 of this title].

"(2) To dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 6 (a) [156 of this title], an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

It was not claimed in the proceeding resulting in the order to cease and desist that either of the two unions mentioned in the order, the Brotherhood of Locomotive Enginemen and Firemen, and the Drivers' Association, hereafter sometimes called the Drivers, had any legal agreement with Greyhound, requiring as a condition of employment membership in one or the other of these two unions, such as is contemplated and recognized as legal in the succeeding paragraph, Section 8 (3) of the Act. The Act, though providing that it shall be an unfair labor practice for an employer: "(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. * * *" also makes the further proviso that, "nothing in this Act, or in the National Industrial Recovery Act (U.S.C., Supp. VII, title 15, secs. 701–712 [15 U.S.C.A. §§ 701–712]), as amended from time to time, or in any code or agreement approved or prescribed thereunder, or in any other statute of the United States, shall preclude an employer from

---

[1] Act of July 5, 1935, 49 Stats. 449, 29 U.S.C.A. § 151 et seq.

making an agreement with a labor organization (not established, maintained, or assisted by any action defined in this Act as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 9 (a), in the appropriate collective bargaining unit covered by such agreement when made."

■ The Drivers had an agreement with Greyhound but it was undoubtedly invalid ab initio because procured by the domination of Greyhound by acts prohibited by section 8.

The petition for a rule to show cause alleges that subsequent to the commission of the acts from which Greyhound was ordered to cease and desist, the Brotherhood of Locomotive Enginemen and Firemen and the Drivers' Association ceased to have any relation to Greyhound or its employees. Prior to April 21, 1937, certain drivers, mechanics, station forces and other employees of Greyhound not already members of a certain affiliate of the American Federation of Labor joined another union entirely disconnected from either the Brotherhood or the Drivers, the Amalgamated Association of Street, Electric Railway, and Motor Coach Employees of America, Pacific Greyhound Division 1114, an affiliate of the American Federation of Labor, and hereafter called the Amalgamated. Through the Amalgamated as their bargaining agent these employees entered into a succession of agreements with Greyhound.

The first agreement of April 21, 1937, provided for the wages, hours and working conditions of the men. On September 7, 1937, Greyhound entered into another agreement with Amalgamated, recognizing Amalgamated as being the duly authorized and sole representative of all its members in negotiating with Greyhound. By its terms it superseded and canceled the agreement of April 21, 1937, and was to remain in effect until December 31, 1938, and thereafter from year to year unless terminated by either party upon giving notice 60 days prior to December 31, 1938, or prior to December 31 of any succeeding year. The agreement incorporated Rules and Regulations Covering Rates of Pay and Working Conditions governing all employees of Greyhound in the classifications covered by the agreement, whether or not they were members of the Amalgamated or had authorized Amalgamated to represent them for the purposes of collective bargaining.

On September 7, 1937, Greyhound and Amalgamated entered into a supplemental agreement whereby it was agreed that within 30 days after approval of the supplemental agreement by a majority of the employees affected thereby and notice thereof to Greyhound, all employees covered by the agreement mentioned in the preceding paragraph must become members of Amalgamated in good standing, and that thereafter any new employee within the classifications covered by the agreement mentioned in the preceding paragraph must within 30 days after the time of his or her employment become a member of Amalgamated.

On April 15, 1938, Greyhound entered into another agreement with Amalgamated, whereby it was agreed that that provision of the agreement of September 7, 1937, as amended by the supplemental agreement of the same date, whereby all employees of Greyhound covered by that agreement were required, within 30 days, to become members of Amalgamated in good standing, should at once go into effect.

The petition makes no claim of any contempt in the making of these contracts and at the hearing here, in this contempt proceeding, the petitioning Board admitted that, unlike as to the above illegal agreement with the Drivers, it did not contend that the agreement finally made was not a legal closed-shop agreement under Section 8 (3) of the Act nor that this latter agreement did not remain as binding on Greyhound and all its employees covered by the agreement until certain acts of Greyhound alleged to have occurred on or about October 31, 1938, and thereafter.

■ The alleged acts of October, 1938, occurred over a year and ten months after the Board's order of December, 1936, during which period we must assume, since the contrary is not alleged, that Greyhound committed no violation of the Act or decree. While the time element here is not the controlling factor, we do not regard it as negligible. The Board claims such action is in contempt of the decree, though it is admitted that Greyhound claims all the acts are justified by its closed-shop agreement legally made under Section 8 (3) of the Act.

On June 3, 1938, a fourth union appears on the scene, the Brotherhood of Railroad

Trainmen, hereafter sometimes called Trainmen. This union is different from the Brotherhood of Locomotive Enginemen and Firemen. The Trainmen attempted to organize the men and on June 7, and 10, 1938, Amalgamated and the Brotherhood respectively filed with the Board petitions alleging that questions affecting commerce had arisen concerning the representation of employees of Greyhound for the purposes of collective bargaining in units composed respectively of the employees in the classifications covered by the agreement of September 7, 1937, and of operators or bus drivers. On June 14, 1938, the Board directed an investigation under Section 9 (c) of the National Labor Relations Act and ordered the petitions consolidated for purposes of hearing. A hearing in which Greyhound and Amalgamated appeared and participated was held on the petitions before a Trial Examiner on June 23, 24, 25, and 27, 1938, and thereafter the Board, on October 29, 1938, issued its Decision and Direction of Elections, finding among other things that a question affecting commerce had arisen concerning the representation of employees of Greyhound within the meaning of Section 9 (c) and Section 2 (6) and (7) of the Act, and directing elections to be held whereby representatives of these employees for the purposes of collective bargaining might be designated and selected.

The elections ordered were held in December, 1938, as to the employees in a group composed of operators or bus drivers, and in January, 1939, as to those in a group composed of certain station forces and clerical employees. The Board's brief admits the two groups together constituted the unit covered by the contract between the respondent and Amalgamated. At the December election, the Brotherhood of Railroad Trainmen was selected as the bargaining agent of the bus drivers. At the January election, Amalgamated failed to receive a majority of the votes cast by the station and clerical employees, the question presented for their vote being whether or not they desired Amalgamated as their bargaining agent. Of the employees of both classes, the principals of the contract between respondent and Amalgamated, only 357 of 948 eligible voters cast their votes for Amalgamated.

Prior to the elections and on or before October 31, 1938, the closed-shop agreement was modified so that it could be terminated by either Greyhound or the then bargaining agent for the men, the Amalgamated, on 60 days written notice from either party to the other. By thus shortening the time for termination of the agreement, Greyhound and the employees, through Amalgamated, facilitated the opportunity for a new bargaining agent to terminate the closed-shop agreement if one were selected at the approaching elections.

We are unable to find in this modification of the agreement any justification for the Board's charge that it constituted a contempt of our decree or any violation of the Act. On the contrary, it seems in aid of the Act's declared purpose of a speedy disposition of labor disputes. We regard the contract, as modified, then to be binding on the employees and on the company and not affected by the fact that undetermined proceedings were pending before the Board. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 237, 59 S.Ct. 206, 83 L.Ed. 126.

At no time since has Greyhound or the majority of the employees, either through Amalgamated or otherwise, given the notice required to terminate the agreement. For all that appears, the employees have not asked and do not desire their new bargaining agent to do anything to change the existing contract.

Greyhound, claiming the closed-shop agreement still binding on it, has by various acts urged the men to remain or to become members of Amalgamated, has aided Amalgamated by offering it the use of its notice boards, given transportation to its representatives and favored it in various ways, arguably illegal under paragraphs (1) and (2) of Section 8, and under (3) of Section 8 in the absence of the contract provided for in that paragraph.

As said, the Board denies the claim of Amalgamated that these acts are justified by the contract, but that is not the question presented in this contempt proceeding. What we are to determine is whether there has been a contempt of our decree enforcing the Board's order. That is to say, whether what Greyhound did in reliance on the contract is something of the same nature it was shown to have been doing in the proceeding leading to the Board's order of December 18, 1936, to cease and desist, or whether it was something different in kind from that from which it was ordered to cease and desist. Obviously, one cannot either cease or desist from something one has not been doing.

The Board contends that because its order prohibited the continuance of favoritism to one named union and discrimination against another named union, neither of which claimed to be acting under a closed-shop agreement made under Section 8 (3), and also favoritism for and discrimination against "any other labor organization", Greyhound was ordered to cease and desist from acts, committed eighteen months after its order, claimed to be justified by a contract authorized by a different provision of the Act affecting some "other labor organization" not even shown then to have been in existence.

If we were to sustain this contention we would transfer from the Board to this court the original consideration of a great number of controversies which the Act provides the Board shall hear and determine. We would be depriving such employees as are represented by Amalgamated and such employers as Greyhound of their broad evidentiary rights created by Section 10 (b) of the Act, 29 U.S.C.A. § 160 (b), that "in any such proceedings the rules of evidence prevailing in courts of law or equity shall not be controlling" and limit them to the narrowing rules of exclusion of a civil contempt trial.

It is our opinion that the issue between the Board and Greyhound tendered in this contempt proceeding, involving as it does the alleged acts of Greyhound, claimed by the latter to be in pursuance of its closed-shop agreement, is essentially different in kind from those raised in the proceeding in which our decree enforcing the Board's cease and desist order was granted; and that Greyhound's motion to dismiss the Board's petition on the ground that it does not allege facts constituting a contempt of this court must be granted.

Were we to consider that the acts done by Greyhound, under the claim of justification of the closed-shop agreement, could be separated from their motive of justification and to hold that they constituted a contempt, we would take into consideration Greyhound's sincerity of motive and its eighteen months' full compliance with the decree, unquestioned in the petition and at the argument, and purge the contempt upon the commencement by Greyhound before the Board of a proceeding to determine the validity of the agreement or the effect thereon of the elections. Since we regard the acts as constituting a new and different transaction, we find it unnecessary to pursue this round about procedure. In this it is to be noted that the Board's petition discloses no complaint to it by the Trainmen or any employee of Greyhound concerning any of the matters here involved.

The rule to show cause is ordered discharged and the Board's petition is ordered dismissed.