## HOLMES v. ATLAS GARAGE DOOR CO. et al.

### No. 2559–Y.

District Court, S. D. California, Central Division.

Dec. 26, 1945.

Lyon & Lyon, by Reginald E. Caughey, all of Los Angeles, Cal., for plaintiff.

Carlos G. Stratton, of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

By a decree entered on October 19, 1943, I found that Letters Patent No. 2228314, is-sued on January 14, 1941, to Verne L. Holmes, the plaintiff, and relating to a balanced door construction, were valid and that the defendants had infringed Claims 1 to 5, inclusive, and Claims 10 to 12, inclusive. The opinion in the case is Holmes v. Atlas Garage Door Co., D.C.Calif., 1943, 54 F.Supp. 368.

An appeal from the interlocutory decree filed October 22, 1943, was dismissed in the Circuit Court of Appeals for the Ninth Circuit on July 20, 1944, 144 F.2d 250, the mandate being spread on the minutes of this Court on September 5, 1944.

On May 14, 1945, a writ of perpetual injunction was issued enjoining the defendants or their agents from "manufacturing and causing to be manufactured, selling or offering for sale, using or causing to be used or otherwise disposing of any devices" embodying the invention, and particularly Claims 1 to 5, inclusive, and 10 to 12, inclusive, of the letters patent.

On June 15, 1944, the plaintiff entered into a license agreement with the defendant Atlas Garage Door Company,—a corporation controlled by the individual defendants Leon A. Wilson and Robert A. Wilson, the former being the President of the company, —whereby it granted them a license to manufacture the patented article throughout the States of California, Oregon, Washington, Montana, Wyoming, Nevada, New Mexico, Colorado, Texas and the northern portion of Idaho north of 44 degrees latitude. The license agreement referred to the Letters Patent, and described specifically the essential features of the patented article.

The paragraphs describing two of them are here given because they affect the present proceeding:

"(b) Means to pivot the arms on the door, so that the arms are adjustable toward and away from each other about their pivots on the door, in the installation of the door;

"(c) Devices to pivotally support the ends of the arms on the building, so that the door may swing upward into said overhead open position."

The license agreement has since been canceled, the cancellation becoming effective on October 5, 1945.

On November 16, 1945, the plaintiff petitioned for an Order to Show Cause why both the corporate and individual defend-

694

ants should not be found guilty of contempt for violating the terms of the permanent injunction.

 That civil contempt is the proper remedy for a violation of an injunction in a patent suit is not disputed. Nor is there any doubt about the extensive powers of the Court to punish the contemnor, in such proceeding, and to award to the patentee damages for infringement from the effective date of the injunction, as well as profits. See Leman v. Krentler-Arnold Co., 1932, 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389; Monroe Body Co. v. Herzog, 6 Cir., 1926, 13 F.2d 705; John B. Stetson Co. v. Stephen L. Stetson Co., 2 Cir., 1942, 133 F.2d 129.

The matter was heard on affidavits presented by both sides, supplemented by depositions. Two accused devices are involved, and counsel for both sides demonstrated their methods of operation in court.

The first accused device was palpably an infringement of the patented article as it contained means of securing pivotal action, —thus achieving the adjustability which I found to be the essential element of the invention.

The defendants sought to avoid pivotal action between the two members of the arm,—the bracket and the sleeve,—of the overhead hardware by a tack weld covering only a small portion of the pivotal area. This had the effect of immobilizing the two members. The tack weld could be readily broken by removing the nut from the bolt and prying between the bracket and the sleeve to exert a force on the weld or by the use of a chisel. Should the weld be broken, the bracket and associated sleeve would become adjustable and the weld, even if not chiseled off, but merely broken, would not interfere with the pivotal action. In addition to this, the extremity of the leg of the bracket extending from the door is rounded so as to facilitate pivotal movement, when the weld is broken.

I am of the view that this was obviously a clumsy subterfuge to avoid the effect of the decree. It is quite apparent that the small size of the weld is a direct invitation to any one possessing any mechanical skill to break it and achieve any pivotal adjustment that might be necessary in a particular installation. So that even if we take at its face value the defendant Leon A. Wilson's denial that he suggested to the purchasers the purpose of the weld and the

manner of achieving a different result, the method adopted speaks for itself, "saute aux yeux",—as the French would say. For it could have no other object.

However, several considerations stand in the way of finding the defendants guilty of contempt for this action.

 There is no evidence before the Court that devices containing this weld were sold in commercial quantities. So far as the record shows, the only sales were the two sales made to persons sent by the plaintiff. And they may have been old devices on hand, antedating the injunction. Of course, this, of itself, would merely affect the extent of the relief to be granted. It is referred to in order to express the view that the broad, summary powers of the Court to punish as contempt a violation of its decrees should not be used, except when there is flagrant violation.

The important fact, however, which calls for denial of relief, is the existence of the license. The license not only referred to the patent, but specifically set forth the elements of the invention which the licensee was authorized to manufacture and sell in certain territories. Pivotability was one of the elements thus enumerated. That this was to be achieved in a clumsy manner is unimportant. The fact remains that, but for the license agreement, the accused device would infringe upon the plaintiff's Letters Patent and would violate the injunction issued against the defendants. By licensing the defendant corporation, the plaintiff, in effect, suspended, during the lifetime of the license, the effect of the injunction.

It is true that the license is between the plaintiff and the Atlas Corporation. But the corporation is controlled by Leon A. and Robert A. Wilson. More, both sales on which the order to show cause was issued were made by Leon A. Wilson, who also signed the sales slips.

 So the matter comes down to this: The existence of the license binds the hands of this Court, so as to prevent our punishing as contempt what the plaintiff, through his license agreement, has authorized the defendants to do in violation of the injunction. Contempt cannot be used to punish infringement against a licensee, whose license is subsequent to the injunctive decree, except when the accused device is not covered by the license or when the violation occurs outside the territory covered by the license. This is not the case

here. The device covered by the license is the identical device involved in the infringement suit, which the injunctive decree sought to protect. And the sale was within the territory granted by the license. Hence the plaintiff is forbidden to resort to the courts, by way of contempt proceedings. His remedy is to sue the defendants on the license agreement. See American Pastry Products Corp. v. United Products Corp., D.C.Mass., 1930, 39 F.2d 181; Radio Corporation of America v. Cable Radio Tube Co., 2 Cir., 1933, 66 F.2d 778, 782; Lewis Invisible Stitch Co. v. Popper, 2 Cir., 1941, 118 F.2d 191.

The second accused device was manufactured after the license agreement had been canceled. So the principles just discussed do not apply to it. However, as to it, we are confronted with the fact that,—whether we take the description of the essential elements of the patented article in the license agreement as true, or go by the claims involved,—the accused device lacks two of the elements. It has no means to pivot the arms on the door and it has no clamp to pivotably support the ends of the arm on the building. In short, pivoting to achieve adjustability, which I declared to be of the essence of the invention, is not a part of this construction.

■ It may well be true,—although I do not assume to decide this now,—that by bending the cast iron pipe, a result, adjustability, may be achieved similar to that achieved by pivoting. As the means of achieving this result in a manner other than by pivoting was not before me in this suit, I do not think that a summary proceeding of this character should be resorted to in order to determine this issue. For the dissimilarity here is substantial and not merely colorable. I should not be called upon in this proceeding to determine whether the accused device comes within the doctrine of equivalents. For the application of that doctrine calls for a consideration of identity of means, operation and result. So doing, the courts must resort to tests such as interchangeability, substitution or elimination of elements, and the consideration whether a manual operation such as is involved in bending a cast iron pipe is the equivalent of a mechanical automatic means of achieving adjustability. See Amdur on Patents, 1935, pp. 619–639; Benoit v. Wadley Co., 7 Cir., 1932, 54 F.2d 1041; Jensen-Salsbery Laboratories v. O. M. Franklin B. Serum Co., 10 Cir., 1934, 72 F.2d 15; and see my opinion in Mantz v. Kersting, D.C.Cal. 1939, 29 F.Supp. 706. All these matters call for new and independent judicial action.

And I agree with the courts which hold that a doubt of the type here involved as to a structure which came into being after the suit was decided, calls for either an independent bill or a supplemental bill directed specifically to the new device and should not be resolved in a summary proceeding for contempt. See Frank M. Smith Metal Window Hardware Co. v. Yates, 2 Cir., 1917, 244 F. 793; Radio Corp. of America v. Cable Radio Tube Corp., 2 Cir., 1933, 66 F.2d 778; Better Packages, Inc. v. L. Link & Co., 2 Cir., 1934, 68 F.2d 904; American Foundry Manufacturing Co. v. Josam Manufacturing Co., 8 Cir., 1935, 79 F.2d 116; Hartford-Empire Co. v. Obear-Nester Glass Co., 8 Cir., 1938, 95 F.2d 414; Gottschalk Manufacturing Co. v. Springfield Wire & Tinsel Co., 1 Cir., 1937, 90 F.2d 468; and see: National Labor Relations Board v. M. Lowenstein & Sons, Inc., 2 Cir., 1941, 121 F.2d 673; National Labor Relations Board v. Pacific Greyhound Lines, 9 Cir., 1939, 106 F.2d 867.[1]

The Order to Show Cause, heretofore issued on November 16, 1945, is discharged without costs to either side.

---

[1] The latter two cases are National Labor Relations Board cases. But they are of importance here because they emphasize the trend in courts, including our own Ninth Circuit Court of Appeals, not to resort to contempt for the solution of substantial disagreements arising subsequent to an injunction, unless the issues are demonstrably identical.