## NATIONAL LABOR RELATIONS BOARD v. NATIONAL LICORICE CO.
### No. 229.

Circuit Court of Appeals, Second Circuit.
June 12, 1939.

———◆———

Charles Fahy, Gen. Counsel, and Robert B. Watts, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., David A. Morse, Atty., National Relations Board, of Newark, N. J., and Laurence A. Knapp, Bertram Edises, and Malcolm S. Mason, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Kotzen, Mann & Siegel, of New York City (Abraham Mann, of New York City, of counsel), for respondent.

Before L. HAND, CHASE, and PATTERSON, Circuit Judges.

656

L. HAND, Circuit Judge.

■ This case comes up upon a petition by the National Labor Relations Board for an order, enforcing its order, entered against the respondent on May 31, 1938, after a hearing upon a complaint under the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. The respondent is a company engaged in interstate commerce, and therefore subject to the jurisdiction of the Board: the unfair labor practices found against it were that it had refused to bargain with the Bakery & Confectioners National Union which represented a majority of its workmen; that it had interfered with, and coerced, them, while acting through that union; and that it had fostered and dominated a company union—the Collective Bargaining Committee of National Licorice Co.—through which · it made unlawful contracts with its workmen, unduly restricting their rights secured by the statute. The upshot of the order was that the respondent should withdraw recognition from the company union, that it should inform its workmen, who had signed the contracts, that they were unlawful, and that it should bargain with the Bakery & Confectioners Workers Union. The respondent raised two objections: (1) that the evidence did not sustain the Board's findings and conclusions; and (2) that if it did, the Board never acquired jurisdiction to deal with the company union or its contracts.

We begin with a narrative of those findings which we think had substantial evidence to support them. The respondent had 140 workmen and workwomen, from whom the union had secured 99 signed applications by July 14th: although not yet accepted by the union, each application designated it as the applicant's bargaining agent meanwhile. So armed, Galvin, the union's president, wired the company on the evening of the 14th, asking for a conference. Sandford, the company's president, at once called a conference of the men, and urged that they do not avail themselves of any "outside union", which he said he would not recognize if formed. He suggested that they should choose a committee of their own, adding, however, that he had no objection to their joining a union, and that he would not discriminate against them if they did. On the 20th Galvin and another officer of the Union conferred with Sandford, presenting to him a proposed contract. Galvin had 109 signed applications at this conference, but he refused to show them to Sandford, giving as a reason that he feared the disclosure of the names might prejudice the company against the signers. Sandford answered that it made no difference, as he could not tell from the applications whether the men had in fact signed them. Nevertheless, Galvin then offered to let him see them, provided that, if he could prove that they made up a majority, he would bargain with the union. This Sandford refused, and the conference ended inconclusively. Sandford had an interview that afternoon with some of the men, in which he offered a five per cent wage increase and one month's vacation. This he asked them to pass on to the others and bring back their answer. Healey, a superintendent, then selected some workmen to get a petition signed, nominating a committee to take the place of the union, but this proved abortive. Another meeting took place on the afternoon of the 29th at which Galvin, Anderson—the union's vice-president—its attorney, and another officer were present, and in which the union's demands were discussed, among which were a closed shop, a change in the wage· schedule and a notice to the union with opportunity to be heard, in the case of all discharges. Sandford spoke from a prepared statement, refused the demands, and made a counter proposal in substantially the same terms as those of July 20th. He declared that he would not deal with the union, but would make individual contracts with the men, the union's function being properly limited to passing on to them the result of any conferences, in order that they might individually sign. The conference went over to August fifth, and on the second the ·men struck. Anderson swore that the union had nothing to do with calling this strike, and the Board so found. Apparently the workmen remained in the factory for four hours, and finally had to be ejected by the police; but as the Board's order does not require any reinstatement, · we disregard this feature of the dispute, though the strike does seem to have been a short "sit down". Sandford refused to have any further dealings with the union after this, and there was some evidence that while the strike was on, he sent agents among the strikers to persuade them to come back, and dissuade them from further dealing with the union. By. the 25th enough did come back to start work, and by September 20th, substantially all were

reëmployed. The origin of the company union dated from August 27th when, according to Healey, one McCann, a workman, saw him secretly, said that he was "fed up with the union", and asked whether the men could not have their own bargaining committee. Healey said yes, provided they could get a majority. By September 9th McCann told Healey that they had elected a committee, and asked him for advice how to proceed. Healey refused to give any advice, but recommended them to Sandford, who prepared the "designation" of a committee for collective bargaining. By the 10th, McCann had secured 109 signatures to this, and gave them to Sandford, who at once began to treat with the committee so constituted. A contract for three years was concluded that day for the same advance in wages that Sandford had proposed on July 29th, but providing that the men should not demand a closed shop, or a signed agreement with any union; and that the company had the unconditional right to discharge any of them for any reason, "regardless of his or their affiliation or non-affiliation with any union", though it would not do so for any "legitimate union activities conducted outside of company time or company property, or because of any affiliation with the union". All the men who had then returned to work signed such contracts severally; and the others did so as they returned. Among these one, Garone, who with thirteen others interviewed the committee in Sandford's office, asked whether they could have one of their number as a member. The committee answered they would have to see Sandford, and when Sandford reëntered the room, he said they could not have a member, because the committee had been already picked and was large enough.

 From the foregoing it appears that Sandford, though willing to deal with the union as the representative of those of his men who were members, was not willing to treat it as a representative of all. Indeed, it is doubtful whether the negotiations on July 29th were bona fide at all, or were undertaken as more than a disguise for a refusal to treat. We need not, however, decide that question, because in any event Sandford denied to the union rights secured by statute. In so far therefore as the order compelled the respondent to deal with the union (paragraphs 1(d) and II(c)) it was justified as of July and August, 1937. The evidence as to Sandford's domination over the company union

is (as was almost inevitable, considering the time and manner of formation) somewhat inconclusive. The strike had failed, and it might well be that the men were "fed up" with the old union; a genuine company union was at least a possible outcome. We think, however, that there was enough to justify the Board that the union actually formed was not a free organization. The contract alone showed that the company was exacting unlawful concessions from it. It is indeed lawful for a union to agree to an open shop; but it is another thing to agree not to propose changing to a closed shop for the period of the agreement, and the word, "demand", covered a proposal. The same is true of the stipulation not to "demand" a signed agreement. A party to a contract does not break it, when he proposes to the other party that conditions have so far changed as to make desirable a change of the contract. There is nothing unlawful in that so long as it is not a masque for threatening to violate the existing contract. Perhaps in labor disputes it ordinarily will be, but the right to propose the change is secured by statute as part of the right to negotiate. The stipulation that the discharge of a workman should not be an occasion "for arbitration, or mediation, and that any action of reinstatement, if any, will be taken voluntarily by the Employer", is somewhat ambiguous. It may perhaps be read as not meant to forbid negotiations regarding discharges, but only to eliminate the remedies mentioned. Even so, "mediation" is close to "negotiation", and the preceding declaration that a discharged workman may put his case personally before the company, suggests that the company union shall not act for him. These facts added to Sandford's insistence that each employee sign the contract, and his assuming to decide the proper size of the committee—following as they did upon a collapse of the strike, and taken in connection with Sandford's pressure on his men on July 14th and 20th—were enough to support those paragraphs of the order which required the respondent not to treat the company union as the representative of the employees (1(a), 1(b), 1(c); 11(a) and II(b)). The situation was clearly within National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and not within Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 231–239, 59 S.Ct. 206, 83 L.Ed. 126, and

658

the company union could be displaced without being made a party.

█ This leaves only paragraphs 1(d), 1 (e), II(c), II(d) and II(e), of the order. Paragraphs I(e), II(d), and II(e) we will not disturb, but I(d) and II(c) seem to us to require some modification. The finding of the Board that the union represented the respondent's workmen, necessarily related to July, 1937; at which time, the union had only just organized the shop. The strike followed in two weeks and failed, and then came the company union: we know nothing more. It is now nearly two years after the tentative organization of the factory, for it was really only tentative, the applicants not having yet been accepted; and our order will be conditional upon the Board's ascertaining by a new election whether the union is now the choice of the majority; otherwise there is some chance that it may not represent their present wishes. In National Labor Relations Board v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, 869, we held that the "Joint Board" had a continued presumptive authority which the employer must overcome by evidence, but in that case the union had been established for a year before the trouble arose. Here there is no ground for such a presumption. Moreover, the workmen are few, and an election will not be an onerous condition.

██ The respondent complains that the Board's order was jurisdictionally unsupported because the "charge" on which the complaint issued, and the complaint itself, contained nothing about the formation of the company union, or the individual contracts of the respondent with the men. We have held that a "charge" is a condition precedent upon the Board's power to issue a complaint (National Labor Relations Board v. Hopwood Retinning Co., 2 Cir., 98 F.2d 97) but we need not consider here how far it confines the proceeding to matters then existing, but not included. For here no "charge" could have included the company union and it was not necessary that it should. The original controversy had resulted in a strike; the strike had failed; the company union followed on the failure; and the Board was within its powers in treating the whole sequence as one, and in reëstablishing the workmen's freedom, by ending the company union's privilege to represent them.

An enforcement order may enter in accordance with the foregoing.