**NATIONAL LABOR RELATIONS BOARD
v. STERLING ELECTRIC MOTORS,
Inc.**

**No. 9209.**

Circuit Court of Appeals, Ninth Circuit.
Jan. 9, 1940.

HEALY, Circuit Judge, dissenting in part.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Laurence A. Knapp, and Russell Packard, all of Washington, D. C., for petitioner.

Hardy & Horwin, Leonard Horwin, and Jack W. Hardy, all of Los Angeles, Cal., for respondent.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

The National Labor Relations Board petitions for our decree disestablishing the Sterling Electric Motors, Inc., Employees

Association, hereinafter described as the Association, a so-called "inside union" of a majority of respondent's employees. It also seeks our frustrating their self-organized contract, evidenced in writing, creating their Association as their bargaining agent, by ordering the respondent to cease and desist from recognizing it in collective bargaining. We are asked to take such action though none of the parties to the contract participated as a party in the Board proceeding.

The situation differs from that in the recent case of the National Labor Relations Board v. Cowell Portland Cement Company, 9 Cir., 108 F.2d 198, decided November 28, 1939, where one of the parties to the frustrated contract was a party in the Board proceeding. There we refused our decree destroying a closed-shop contract recognized in Section 8(3) of the National Labor Relations Act, 29 U.S.C.A. § 158(3), because in the absence of one of its parties as a party to the proceeding the decree would have been a violation of one of the civil liberties of the employees.

Here the self-organizing contract and the labor organization so formed are of the character which, unless invalid, have the special protection of Sections 2(4), 2(5) and 7 of the Act, 29 U.S.C.A. §§ 152(4, 5), 157.

It is clear that here again we are asked to deny the civil liberty freely to contract and to have the benefit of the contract until it is held illegal by a competent tribunal after notice and the opportunity of a full and fair hearing, protected by the due process clause of the Fifth Amendment of the Constitution. The Board asserts that this denial has been its established practice in administering the National Labor Relations Act and cites some of the cases proving its assertion.

The Board earnestly claims that it has justification in decisions of the Supreme and other courts. Because of the obvious importance of the assertion of the propriety of such a practice in seeking to accomplish the beneficent purposes of the legislation we have given the claim of its legality our extended consideration.

In addition to our decree thus in effect against the employees and their labor organization, the Sterling Electric Motors, Inc., Employees Association, the Board petitions for our decree requiring respondent to cease and desist from certain other acts, later discussed, which the Board finds in violation of Section 8, subdivisions (1) and (2) of the National Labor Relations Act, 49 Stat. 449, 452. No question is raised concerning the interstate character of respondent's commerce nor that such commerce would be affected if the violation charged had been proved.

The Board's order of disestablishment of the Association provides that respondent shall "(a) Withdraw all recognition from the Sterling Electric Motors, Inc., Employees Association as a representative of any of its employees for the purpose of dealing with the respondent concerning grievances, labor disputes, wages, rates of pay, hours of employment, or other conditions of employment, and completely disestablish said Association as such representative;".

The employee-members of the Association are 49 mechanics and others, being about 70 percent of the men engaged in the manufacture of electrical appliances. Their contract of self-organization was in writing, later set forth in full. The Association had a committee as its representative to secure the Association's recognition as bargaining agent. The Board not only did not make any employee or the Association a party, but it gave neither the men nor the Association any notice of the proceeding, much less that what was sought was the destruction of their union by disestablishment. The responsible officers of the Association were mechanics, employees of respondent, and hence there was facility in joinder and service, if in any case that be a pertinent matter.

Neither any one of the employees nor the Association appeared as a party below. There was no one below and there is no one appearing here to speak as their advocate.

Such men have none of the protection and advice of the skilled labor organizers and counsel of the nation-wide federations and associations. It is true the mechanic-members of the bargaining committee were called as witnesses but, as we have held in National Labor Relations Board v. Cowell Portland Cement Co., 9 Cir., 108 F.2d 198, decided November 28, 1939, witnesses are not charged with knowledge of the pleadings or relief sought. Nor has a witness any right of counsel nor any right to participate in the proceeding by cross-examination or the introduction of testimony. The right in the "discretion" of the Board to intervene un-

der Section 10(b) of the Act, 29 U.S.C.A. § 160(b), is no more a substitute for the service of the complaint, notice and hearing than it would be in any litigation where a person not made a party is to be affected by a judgment.

Later we show in detailed consideration of the evidence at the hearings how helpless these laborers there were to protect their Association and the contract rights of each and of the Association from their frustration and, in effect, destruction by disestablishment. In no class of trials is the presence of counsel for the parties sought to be deprived of their property more required than in these proceedings before the Board.

■ In such a situation a court of Anglo-American justice is required *sua sponte* to examine with the meticulous care of a court of equity[1] the treatment by an administrative board or other tribunal of the absent persons from each of whom may be taken fundamental rights. Here the character of the rights is obvious. They are of liberty to contract with regard to the employment in which most of the creative effort of worker's spirit and body are spent, and of property in the contract creating the labor organization which leads to security in and betterment of that employment. As the Supreme Court early said in a case, cited last year by that court in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 233, 59 S.Ct. 206, 218, 83 L.Ed. 126, with reference to the labor contract there destroyed by the order of the Board: "The established practice of courts of equity to dismiss the plaintiff's bill if it appears that to grant the relief prayed for would injuriously affect persons materially interested in the subject-matter who are not made parties to the suit, is founded upon clear reasons, and may be enforced by the court, *sua sponte,* though not raised by the pleadings or suggested by the counsel. Shields v. Barrow, 17 How. 130, 15 L.Ed. 158; Hipp v. Babin, 19 How. 271, 278, 15 L.Ed. 633, 635; Parker v. Winnipiseogee Lake Cotton & Woolen Co., 2 Black 545, 17 L. Ed. 333." Minnesota v. Northern Securities

Co., 184 U.S. 199, 235, 22 S.Ct. 308, 322, 46 L.Ed. 499.

The Consolidated Edison case also cites with approval to the same point from Mallow v. Hinde, 12 Wheat. 193, page 198, 6 L.Ed. 599: "We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction. We put it on the ground that no court can adjudicate directly upon a person's right, without the party being either actually or constructively before the court. * * *"

This court recently has indicated its attitude where such situations arise in National Labor Relations Board v. Cowell Portland Cement Co., supra. Cf. Wallace v. Hudson-Duncan & Co., 9 Cir., 98 F.2d. 985, 992; National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 94 F.2d 671, 673.

■ Realizing this attitude, the Board in brief and argument sought to justify its order disestablishing the absent and helpless Association on the ground it did not destroy anything of value which the employees possessed. It urged that the Association was not destroyed because it could still have social enjoyments and its members continue to "drink their beer" as they had at one of their meetings. We find no merit in such a contention. The "self-organization" Congress seeks to protect is the self-organization of "employees" in dealing with their "employer" with regard to wages and working conditions. The decree sought from us not only destroys all contact of the Association with the employer for these purposes but asks something *in addition*—namely, *disestablishment,*—a destruction of the Association for all the purposes recognized by Section 7. Here the evidence shows that probably they would drift into an entirely different labor organization.

■ With regard to the destruction of the employee's right to contract and his property in his contract it cites National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, at page 271, 58 S.Ct. 571, at page 576, 82 L.Ed. 831, 115 A.L.R. 307,[2] where the court says,

---

[1] Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S. Ct. 301, 306, 83 L.Ed. 221.

[2] In National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, given on the

same day, reversing our decision, the opinion does not mention the fact appearing in our opinion (page 460, 91 F. 2d 458) that "The Drivers' Association was not made a party to the proceedings" and "was not notified of the hearing."

"As the order *did not run against the Association* it is not entitled to notice and hearing. Its presence was not necessary in order to enable the Board to determine whether respondents had violated the statute or to make *an appropriate order against them.* See General Investment Co. v. Lake Shore & M. S. Ry. Co., 260 U.S. 261, 285, 286, 43 S.Ct. 106, 116, 67 L.Ed. 244." (Emphasis supplied)

This, it must be noted, was said without counsel for the union to present the argument respecting the civil liberties and rights of the absent union to have notice and the opportunity to appear. Had the employees or the disestablished Sterling Association been represented by counsel at the argument here and it had been indicated that this court were about to utter the sentences above quoted, we may properly assume he would have urged that though *formally* the destroying order is directed to the employer, the order disestablishing a union does destroy it and does destroy the very property rights of the employees in the contract of union association.

It might have been suggested that according to employees such rights of notice and opportunity to be heard in certain cases might create great administrative inconvenience such as where a large number of employees had individual labor agreements with their employer. Cf. National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655, 657. Such counsel may well have answered that a multiplication of the denial of a civil liberty increases instead of decreases the wrong done. He also might have answered that a process of service by publication could be devised.

One may assume that such counsel would have asked whether, if one of three parties to a contract to build a bridge brings a suit against but one of the two others in which it is sought to enjoin the respondent from performance of the contract because he had defrauded the absent party, and at the trial evidence of fraud is offered, an injunction could be granted because the writ would *"run against"* the party sued and not the absent party, although valuable contract rights of the latter thus were destroyed.

Such counsel could well have argued that, while incidents of property rights are often legally impaired or deprived in the administration of broadly regulatory measures in the public interest, such impairment or deprivation is justified because *necessary* to attain the desired public benefit. What necessity in its enforcement or *possible* public gain with reference to the beneficent objectives of the National Labor Relations Act could Congress see which required the deprivation of the absent union or its members of their civil liberty to receive notice and be given opportunity to be heard in a proceeding seeking to destroy their contract creating the collective bargaining agency for which Section 7 of the Act provides? The present rule of the Board, later considered, now requiring such notice, is conclusive evidence of the absence of any such necessity.

So also had the absent ones been represented by counsel, he might have pointed out that an employer, inimical to labor and really hoping to destroy a union he *appeared* to help, well might "ride to a fall" in defending the union's right in some such manner as indicated in our opinion in National Labor Relations Board v. Cowell Portland Cement Co., supra.

The language quoted from the Pennsylvania Greyhound case comes without the consideration in the opinion of any of these matters. It does not even mention the civil liberties of the union employees with respect to their opportunity to defend their right to liberty of contract or of property in a contract as being of the very character Section 7 of the Act seeks to protect. This is not to say that we can disregard the Pennsylvania Greyhound decision on the principle stated by the Supreme Court that "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents. See New v. Oklahoma, 195 U. S. 252, 256, 25 S.Ct. 68, 49 L.Ed. 182; Tefft, Weller & Co. v. Munsuri, 222 U.S. 114, 119, 32 S.Ct. 67, 69, 56 L.Ed. 118; United States v. More, 3 Cranch 159, 172, 2 L.Ed. 397; The Edward, 1 Wheat. 261, 275, 276, 4 L.Ed. 86. * * *" Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411.

Whether or not the question of civil liberties merely lurked in the record in the Pennsylvania Greyhound case, it cries aloud in the case before us.[3] If the former case

---

In National Labor Relations Board v. National Licorice Co., 2 Cir., 104 F.2d 655, 657, cited by the Board, Judge Learned Hand's opinion accepts the Greyhound decision without mentioning the Morgan case, considered infra.

[3] As it did to us in National Labor Relations Board v. Pacific Greyhound

supports the contention of the Board here, it certainly is not supported by the principles restated for administrative boards in Morgan v. United States, 304 U.S. 1, 58 S. Ct. 773, 999, 82 L.Ed. 1129. There, at page 22, of 304 U.S., at page 778 of 58 S.Ct., 82 L.Ed. 1129, administrative proceedings are commanded to observe "the cherished judicial tradition embodying the basic concepts of fair play" and in them men are to have their day in court and to be given the "essentials of a full and fair hearing, with the right * * * to have a reasonable opportunity to know the claims advanced against them * * *." (304 U.S. page 21, 58 S.Ct. page 777, 82 L.Ed. 1129) Cf. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

In our opinion if the Pennsylvania Greyhound case established for that case principles justifying the destruction of the absent Association and the civil liberty to contract of the absent employees, it is overruled in principle by Morgan v. United States, supra.

■ So far as concerns the protection given employees by Section 7 of the Act, we are unable to distinguish in principle between the contract made by the union with the employer in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 233, 59 S.Ct. 206, 218, 83 L.Ed. 126, and the contract here considered. Here the self-organization of Section 7 sought to be destroyed consisted of a contract in which there is a surrender by each employee to the associated majority group of his individual bargaining right and the creation of greater power of collective majority bargaining provided for in Section 9(a), 29 U.S.C.A. § 159(a). In the Consolidated Edison case there was a contract by the employees through their bargaining agent with the employer creating rights of employment also recognized by the Act. The principles of civil liberty involved in the destruction of these contracts, in the Consolidated Edison case in the absence of one of the contracting parties, and in the Greyhound cases of all of them, are the same for both.

We do not concur in the dissents of Justices Reed and Black in the Consolidated Edison case, supra, 305 U.S. page 250, 59 S.Ct. page 226, 83 L.Ed. 126, that because the union might intervene in the circuit court of appeals and be permitted in that court's discretion to offer "additional evidence" in the proceeding below, that there is no denial of the civil liberty in question. When any case has been decided by a lower tribunal its form is in a sense frozen. To return this case to the Board merely to receive additional evidence presents the difference between fabricating from the molten material a steel shape and returning the hardened shape to be refabricated into another form.

A complete trial de novo is necessary on all issues affecting the union for, obviously, a union, as litigant, should have the right of cross-examination of the Board's witnesses. Equally obviously, it should have the right of cross-examination of the employer's for, as stated, the employer really may not be in favor of the union and "riding to a fall" in a pretended defense of the union's organization or contracts.

In the Consolidated Edison case the court was required to apply the principles of "fair play" to the contract there in question and, in a dictum, it distinguished it from the contract in the Pennsylvania Greyhound case. In making that distinction, the Edison opinion fails to note that the order set aside in the Edison case and that upheld in the Greyhound case "ran against" the employer only. It "did not run against" either the absent association in the earlier or the absent Brotherhood in the later case. If failure of the order destroying the Greyhound association's contract of claimed self-organization to run against the association justifies it, then the order set aside in the Edison case should have been held valid.

■ We have here a contract like that in the Greyhound case and we hold that, since the Association was neither made a party nor given notice and an opportunity to be heard, it was not treated in accordance with the basic concepts of fair play and that we cannot order the disestablishment of the Association formed by that contract.

■ If we be in error with regard to the present law regarding the civil liberties of employees, and the Board has the power to destroy any of them, there is nothing in the Greyhound cases which requires that

Lines, 9 Cir., 91 F.2d 458, 460, reversed 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, where we made the error of assuming it was so clear that we thought it unnecessary to give it the detailed consideration of this opinion.

the power always *must* be exercised. In this case it is clear that it was an abuse of the Board's discretion to fail to join the Association or its member-employees whose bargaining agent it became or to give notice of the hearing with the right to be heard.

Subsequent to the making of the Board's order it enacted a rule providing for the service on labor organizations such as the Association here of a copy of complaint and notice to appear where employer domination is alleged. The second paragraph of Section 5, Article II of its rules provides: "Whenever the complaint contains allegations [of employer domination] under Section 8(2) of the Act, any labor organization referred to in such allegations shall be duly served with a copy of the complaint and notice of hearing. Whenever any labor organization, not the subject of any 8(2) allegation of the complaint, is a party to any contract with the respondent the legality of which is put in issue by any allegation of the complaint, such labor organization shall be made a party to the proceeding."

■ The Board's position, in effect, is that Congress intended such a rule requiring service and notice to be a matter of the Board's grace and not of right and that because such grace was not extended to the Sterling Company's employees we cannot consider they have been denied any civil liberty. As indicated, we do not believe that Congress regarded the civil liberties of employees in the making and maintaining of labor organizations of Section 7 of the Act to be subject to their deprivation at the discretion of the Board. Cf. National Labor Relations Board v. Cowell Portland Cement Co., supra.

In this situation we would be entitled under the decision in Ford Motor Co. v. National Labor Relations Board, 305 U.S. 364, 373, 59 S.Ct. 301, 306, 83 L.Ed. 221, to pursue the course followed by us in the Cowell Portland Cement case and remand the case to permit the joinder of the Association or its members if the Board deemed it wise to continue the proceeding. However, our analysis of the testimony shows that no purpose would be served by such a remand. What we have before us gives no substantial support for the disestablishment the Board here seeks.

The facts of this case compel the consideration of the dilemma confronting the employees of these smaller independent industrial units. The census shows they constitute a vast majority of the manufacturing plants of the country. The evidence here proves the intimate contact of the Sterling employees in seeking betterment in wages and hours, not only with their foreman but directly and as intimately with the general manager and the superintendent. This dilemma for these men and men everywhere in the United States in these smaller plants has three alternative solutions.

One alternative is to join the great internationals or associations. These give added power often to correct abuses which otherwise could not be remedied. However, they may have a remote control by men, sometimes with power almost autocratic but unfamiliar with the particular small plant problems. They collect larger dues, often to support general sympathetic strikes with which the employees of the independent plant may have no sympathy, and sometimes to be spent in aid of office seekers to whom they are opposed. Into these larger associations the small plant employees are sometimes forced by outside picketing and sometimes by actual violence. When so forced their collective bargaining agent may be designated by methods as remote from "their own choosing" as where the employer influences or dominates their choice.

Another alternative is the so-called "inside union". While this is exposed to possible employer domination by the very intimacy of the small plant activities, where properly organized it has "the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee" recognized and approved by the Supreme Court. Texas & N. O. R. Co. v. Railway & S. S. Clerks, 281 U.S. 548, 568, 50 S.Ct. 427, 433, 74 L.Ed. 1034. In these normal relations the employees often learn whether the plant is prosperous or is running at such a loss that any increase in the wage factor of the cost sheet makes certain the shut-down of the plant entirely or in the department showing the larger red ink figures. That is to say, the employees know what pressure for their betterment will and what will not cause the loss of employment of all or of some of them. Obviously such a small union may be far more advantageous to its members than one under the remote control of policy makers thousands of miles away.

 The third alternative for the small plant seems almost ignored in the titanic struggle for power of nation-wide internationals and associations, though the right to choose it is as worthy of the consideration of courts and legislatures as either of the other two. That is the right not to join or create or assist any labor organization at all, but to deal individually with the employer. What we have described above regarding the result of "normal relations and innocent communications" between employers and employees properly may lead the latter to choose to remain unorganized. The Supreme Court construes a predecessive statute for the protection of collective bargaining[4] as not prohibiting the employer's "entering into such contract of employment as it chooses, with its individual employees," Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 557, 57 S.Ct. 592, 604, 81 L.Ed. 789, and puts a like construction upon the National Labor Relations Act, National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 45, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. In a proceeding seeking to destroy a labor organization, we do not interpret the intent of Congress in enacting the Labor Board legislation to have established any presumption that employees are always to be deemed to be aiding a violation of the Act if they prefer no organization and decline to create one.

[11] Each of these three rights is of equal value and in administering the National Labor Relations Act is entitled to the protection of the Board. The Sterling company's employees' choice of the second alternative did not receive such protection.

The evidence shows an unsuccessful attempt by the International Brotherhood of Electrical Workers to organize a majority of the employees into one of its independent but affiliated labor associations called "units" and a successful self-organization of the men into the Association. The claimed violation of the Act is the obstruction by the respondent of the Brotherhood activities on behalf of the unit and the favoring of the Association.

Commencing about May 20, 1937, the employees began a self-organization movement which finally created the Association sought to be disestablished. The Board does not contend, and could not on the record before us, that the respondent suggested to the employees the formation of an inside union or that it directly aided or encouraged the movement among the employees which resulted in their forming a labor organization stated in a document signed by 49 of the 60 to 70 employees and requesting a meeting of respondent's representatives with their committee. The committee presented to respondent's representatives the petition which contained the following statement of the Association's character, the desire for collective bargaining with respondent, and proposal for recognition, which, since the statement was signed by 70 percent of the employees, undoubtedly meant recognition as exclusive bargaining agent:

"June 1—1937

"We, the undersigned Employees of The Sterling Electric Motors, Have formed a Company union, And Ask the Company to have its representatives meet with Committee men of said union at the Companys convenience for the purpose of debating the recognition of Employees union. Also for Collective bargaining, And such things as may at future time arise.

"Signed

\* \* \* \* \* \*."

 The document was post-dated to June 1, 1937, the employees having signed at various times in the latter part of May, 1937. The Board does not question that, in this comparatively small plant of 70 employees, the entire group of employees was the appropriate unit nor that the signatures were those of 49 employees. We hold that the self-organization evidenced in the document and creation of the committee is such a "labor organization" as is recognized by Sections 7, 2(4) and 2(5) of the Act. It does not matter that there were no charter or by-laws or dues as in many other unions. Without these, there was self-organization for the purpose of dealing with the employer. These employees later developed their organization until it had the customary by-laws, officers and dues, but such a development was not prerequisite to the existence of a "labor organization". Employees are none the less self-organized when they have associated together as in their signed statement here and have a committee to represent them, though they have no lawyer or skilled secretary for drawing more formal documents.

---

4 Sec. 2, Railway Labor Act as amended in 1934, 45 U.S.C.A. §§ 151a, 152.

The Board, on conflicting evidence, finds that on June 2 Bueter, one of the Association's organizers, tendered this organization agreement with its petition for recognition "to Harder, the plant superintendent, who took it and promised to see that it was given to the management." The plant superintendent is the executive closest to the workers and no doubt a mere reading of the signatures showed the creation of the majority bargaining agency. However, here were three or four days for respondent to determine the majority character of the representation before June 6, when it was accepted as the bargaining agent.

The three committeemen on June 6, 1937, met with respondent's President Johnson, General Manager Mendenhall, and Superintendent Harder. After some discussion as to the nature of the committee's plans, Mr. Bueter, one of the committeemen, asked respondent for recognition. Mendenhall inquired whether the company union *committee* were a temporary one or whether it had been permanently organized. He was told by Bueter that "they were not, that this was merely a temporary *committee;* if we would recognize them, they would meet and finish up their organization". (Emphasis supplied). Since Superintendent Harder had had three or four days to determine whether the signers were his employees, the recognition was granted after the president and general manager counted the names on the document.

The Board's brief strongly urges this action of the management after four days' notice of the Association's majority bargaining agency as "immediately" according recognition; that it was "precipitately taken without pretense of diligence in examining or requiring a determination of the two conflicting claims to majority representation,".

The Board is here asking us to apply an entirely different criterion of the employer's duty to recognize a bargaining agency where it is an "inside" union from that applied to the national Brotherhood. On May 26 the Brotherhood's national organizer, a Mr. Kelly, had a meeting with Mr. Mendenhall in which he claimed he represented 90 percent of the respondent's employees and asked recognition as their bargaining agent. He offered Mendenhall no proof of any kind, written or verbal, in support of his claim and the trial examiner, after discovering that Kelly had made no check of the figures and was not a member of the "unit" in which he claimed majority existed, struck out his testimony of the 90 percent claim. Since the Brotherhood appeared as the complaining union, it is obvious that if such a majority existed it would have been proven. Mendenhall neither accepted nor declined to recognize Kelly as the bargaining agent of his employees during the conference which covered several other matters. Mr. Kelly never returned to Mr. Mendenhall with any proof of his agency and the Board's brief disavows any claim that he was entitled to recognition as a bargaining agent.

The interview with Mendenhall lasted *two hours.* The fact that in these circumstances he neither recognized nor refused to recognize Kelly's claim the Board's brief would have us hold is an "evasion", "completely disregarding" the great union's claim, to be contrasted with the "immediately" and "precipitately taken" recognition of the inside union at least *three days* after admittedly true written evidence of its right to majority bargaining had been presented.

We hold there is no merit in this contention of the Board which, in its effect, is that Congress, in enacting in Section 7 of the Act the right of employees either to "self-organization" or to "join" a union of their choice, intended a different criterion in the consideration of the action of this employer toward "self-organized" inside associations from that toward an international such as the Brotherhood seeking to have the employees "join" one of its units.

We are also unable to agree with the Board that there is significance, with reference to destroying the Association, in the temporary committee's statement that the "committee" would organize permanently if the Company would recognize it, followed by the Company's recognition. The Association was organized and could act through a committee or otherwise. The majority status of the Association required the Company to recognize it at once.

The fact that the three committeemen indicated they would not organize themselves permanently against their employer's wishes is strong evidence that the employer had not aided them in the organization of the Association nor had ever indicated to them the favoring of the so-

called "inside union" against the International Brotherhood of Electrical Workers, which also was seeking to organize the men.

Since employees have as much a right not to organize as to organize, to convert a willingness not to organize into an argument of dominance over the men seems to us unwarranted, for, as we have stated above and elsewhere[5] in our opinion Congress did not intend to establish a principle that employees are presumed always to be the antagonists of their employers. On the contrary, men may properly take into consideration financial difficulties of the employer in connection with their demands for improved labor conditions. It would not have been improper for them, in view of the uncontradicted evidence of the prior financial embarrassment of the Company, to take the employer's word for it, if it had been stated, that they would gain no more with the Association than they would without it. Of course, if the employer had said, "You are in for a fight if you attempt to organize" or had shown some equally adverse position to their recognition and the Association of 49 men had not resisted, there would be grounds for a charge against the employer of domination and against the Association of an acquiescence warranting disestablishment. Here the exact reverse is true.

Nor do we agree with the Board that there is any impropriety in President Johnson's statement, *after* recognition had been conferred, that "We will probably have trouble with outside unions, but go ahead with this—I mean the office will have the trouble, not you men." We do not believe Congress intended that an employer must be so at arms length with a majority of his employees that he cannot state to them what was an obvious truth concerning the great A. F. of L. union seeking to bring all respondent's employees into its outside Brotherhood.

Likewise there is no merit in the Board's contention that it is significant with reference to disestablishing the Association that after its independent organization Mendenhall stated: "I like this company union idea. It is a splendid way for the men and the office to get together in their understandings." What happened eight days later shows that this statement was not a mere evasive easing along of the men seeking conference for their betterment.

On June 14, the Company's superintendent in a posted notice described the granting of a substantial gain in the employees' wages and working conditions, as follows:

"Notice

"To all employees on hourly and piece work basis:

"The proposition of a forty (40) hour week and time and a half for overtime, *which was submitted to the company by the committee representing your organization,* has been duly considered by the management and passed upon favorably. Therefore, beginning Thursday, July 1, 1937, the plant will change over to schedule of forty hours per week. The daily schedule will be the same as at present; starting at 8:00 a. m. to 4:30 p. m. Monday through Friday. All time over the eight hour day or forty hour week will be paid for on the basis of time and a half. However, the company desires at this time to continue to operate on Saturdays, as at present from 8:00 a. m. to 12:00 noon. However, due to this time being in excess of the forty hours per week, it will be paid for at the rate of time and a half for overtime. [Emphasis supplied].

"Those working on the second shift will work as at present but will be paid for time over the forty hours per week at the rate of time and a half.

"The company at this time desires to express its admiration for the commendable method and manner which the employees chose to bring about an amicable solution of their problems and also hope that your organization will be a means of better understanding of the problems of both the company and its employees. They also express their willingness to deal with its employees in the future as it has in the past whenever a question arises pertaining to remuneration, hours, conditions, etc.

* * * * *."

While the Board finds that this notice is "seemingly innocuous in itself", its brief claims that the statement concerning the submission of the 40-hour week and time and a half overtime by the Committee is "completely false" and the Board finds it such a violation of the Act that, combined with other violations, it warrants the

---

5 International Brotherhood of Teamsters, etc. v. International Union of United Brewery etc. Workers of America, 9 Cir., 106 F.2d 871, 875.

disestablishment of the Association. It is claimed that the effect of the fraudulent misrepresentation is to persuade the employees to prefer the Association and not join the Brotherhood's unit.

■ This claim of fraud is not mentioned in the complaint, much less charged as an unfair labor practice. Not only is it not charged but nowhere in the course of the trial is such fraud made to appear as an issue of fact to support either the disestablishment or the cease and desist orders. Assuming that without charge it can be made the basis of disestablishment or a cease and desist order, the substantial evidence (National Labor Relations Board v. Columbian, etc. Co., 306 U.S. 292, 299, 59 S.Ct. 501, 83 L.Ed. 660[6]) to support the order must have the substance of other cases of fraudulent misrepresentations. The Act has not abolished for employers the universally accepted presumption stated by the California Code Civil Procedure Sec. 1963(19), that "private transactions have been fair and regular," and by this court as "in favor of integrity of conduct," Jenkins & Co. v. Anaheim Sugar Co., 9 Cir., 247 F. 958, 961, L.R.A.1918E, 293, or the requirement stated by the Supreme Court concerning fraudulent representations that "Fraud is never presumed, and where it is alleged the facts sustaining it must be *clearly* made out". (Emphasis supplied) Clark v. Reeder, 158 U.S. 505, 523, 524, 15 S.Ct. 849, 857, 39 L.Ed. 1070.

■ The rule regarding the weight of evidence to sustain the orders of the Board established in the Columbian, etc., Co. case, supra, 306 U.S. page 300, 59 S.Ct. page 505, 83 L.Ed. 660 is that it must be "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." A trial court would not be justified in refusing to direct for the defendant upon the plaintiff's tendered issue of fraudulent representations if it is not "clearly made out" that the mis-

representations had been made. In view of the holding in the Columbian case we are constrained to hold that Congress did not intend the self-organization referred to in Section 7 of the Act to be frustrated or disestablished on any lesser amount of evidence.

The introduction of the notice is evidence that such a proposal was made by the Committee. The notice does not assert that the Committee *had a meeting* with the management at which the proposal was made, and it is obvious that in the eight days between the first meeting of the Committee and the management and the posting of the notice there were many other ways, customary in the relations of employee and employer, for the 40-hour week and overtime proposal to be submitted. It might have been by a letter, or by a telephone request, or in a call on one of the managers by one of the committee, or through one of the straw bosses who took it to the management.

Nevertheless the entire case of fraud is built up primarily on the theory that *only at a meeting* between the Committee and the management could such a proposal be submitted.

Without indicating that they were attacking the truth of the statement in the notice that a proposal *somehow* had come from the Committee, various witnesses were asked what happened at *meetings* between the Committee and the management. Three were asked concerning the meeting of June 6th whether "at *that* meeting" (emphasis supplied) anything occurred regarding changing working conditions and it is testified nothing of that kind occurred. Later one of the committeemen was asked concerning the first *"meeting"* with the management "to negotiate" labor conditions and stated it was in the following September.

The only testimony which taken with that concerning the September meeting

---

[6] Other circuit courts of appeals in setting aside orders of the Board have considered the rule regarding the required substantiality of the evidence. *Second Circuit:* Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 98 F.2d 758, 760, 764; *Third Circuit:* National Labor Relations Board v. Swank Products, Inc., 108 F.2d 872, December 29, 1939; *Fourth Circuit:* L. Greif & Bros., Inc., et al. v. National Labor Relations Board, 108 F.2d 551, December 28, 1939; National Labor Relations Board v. Asheville Hosiery Co., 108 F. 2d 288, December 15, 1939; Appalachian Electric P. Co. v. National Labor Relations Board, 93 F.2d 985, 989; *Fifth Circuit:* National Labor Relations Board v. Bell Oil & Gas Co., 98 F.2d 406, 410; *Sixth Circuit:* National Labor Relations Board v. Thompson Products, 97 F.2d 13, 15; *Seventh Circuit:* Jefferson Electric Co. v. National Labor Relations Board, 102 F.2d 949, 955.

would appear to sustain the charge of fraud, is that of Bueter, one of the committeemen, but it has that effect only if one question and answer are torn from their context. The question and answer are:

"Q. Now, following this first meeting with the management, what did the employees do, or what *did you do with reference to the employees' association?* A.

The first thing we did we got busy and looked up a hall and had a meeting [after the posting of the notice]." (Emphasis supplied.)

This loses all its probative force when read with Bueter's preceding answer and his preceding and succeeding testimony, given in full in the footnote, which contains all the testimony cited by the Board on this issue.[7] Bueter's interrogation was

---

[7] The confining phrases "at that meeting" and "at that time" referring to the meeting of June 6, 1937, are italicized in the testimony relied on by the Board:

Warner, a member of the Committee, testified:

"Q. What was discussed at that meeting? A. The petition was presented to them. There was nothing more discussed about the Association, with the exception of the recognition and for collective bargaining. * * *.

"Q. Anything else discussed *in that meeting?* A. No, not in regards to the Association."

Broadway, another committee member, testified:

"Q. What was discussed *at that time,* if anything, relative to any wage scales or any changes in the operation of the plant? A. There was nothing."

Johnson, President of the respondent, testified:

"Q. Were any demands made upon the company *at that time* other than for recognition? A. No. I remember distinctly asking the committee whether there was anything that they wished to discuss or take up with us *at that particular date* when they brought the petition in,—a little after it was brought in. They said no; that they would arrange another meeting later after they really had something to talk about."

At the meeting of June 6, 1937, the principal topic of conversation was the further organization of the Association. Bueter, one of the committeemen, knew so little about labor organizations that he thought the Association might obtain some kind of charter, later realizing he meant by-laws. Having further organizing in mind, Bueter testified concerning "that meeting":

"Q. What did he [Manager Mendenhall] say about a charter, if anything? A. Nothing. The charter was brought up by me, myself. After we got through with this and they recognized this, I told them I possibly might have to get a charter for this organization.

"Q. What do you mean by a 'charter'? A. Well, a charter; the same as any organization has to go through certain

rules and regulations that you have got to do. I told them I could find out whether we would have to have one.

"Q. What else did you talk about *at this first meeting* with the management that you have described? A. There was nothing more, only in the end they recognized it. * * *

"Q. After Mr. Mendenhall said he would recognize your association, what was then done? A. We adjourned at that time. We might have sat there and talked a little while about general conditions in the factory, *but nothing about the organization.*

"Q. Now, following this first meeting with the management, what did the employees do, or what did you do *with reference to the employees' association?* [Note *not* with reference to the management of the company.] A. The first thing we did we got busy and looked up a hall and had a meeting.

"Q. Who is 'we'? A. The committee.

"Q. Consisting of whom? A. Mr. Warner, Mr. Broadway and myself.

"Q. You looked up a hall? A. Yes, sir.

"Q. Did you locate one? A. Yes, sir. * * *

"Q. Was that meeting held? A. Yes.

"Q. Who presided? A. I opened it.

"Q. How many were present? A. I should judge between 30 and 35.

"Q. What happened *at that meeting?* A. Well, the first thing we opened the meeting for nomination of officers.

"Q. What happened after that? A. Then they started to nominate the officers, and they nominated a president, to start with.

"Q. Who was nominated president? A. Mr. Manes, and there was somebody else. I don't remember who it was.

"Q. Who was elected? A. Mr. Manes."

Concerning the September meeting with the management, Bueter testified as to what happened "at that meeting":

"Q. When, with relation to the first meeting, or the second meeting, of the membership in the Employees' Association, did you *meet* with the management *to negotiate* certain changes in working conditions? A. I don't think *we met* un-

confined to the further "organization" of the Association. It had no reference to the Association's relation to the management. There was no intimation that what was under discussion was with reference to the submission of any proposal to the management by the various likely mentioned channels in the eight days before the posting of the notice.

Even a lawyer trained in trial work would not have been likely to guess that these questions and answers had anything to do with the undisclosed purpose to prove fraudulent representation in the notice of June 14. How much less the mechanic Bueter,—who later found his testimony concerning the steps in organizing the employees' Association made the basis for its disestablishment, and that in all their future relations with the Company they would be hampered by a management in constant apprehension of contempt proceedings under a general cease and desist order. Cf. National Labor Relations Board v. Pacific Greyhound Lines, 9 Cir., 106 F.2d 867, 871.

██ The burden of proof of the fraudulent representation has not been maintained by such a showing concerning the "meeting", whether or not it be no more than in cases where the issue is not one of fraud. The vital question is what happened in the eight days between the meeting and the notice.

What is further relied upon to prove the uncharged and undisclosed contention of fraud, is the testimony of Superintendent Harder that the company's statement concerning the "proposition" for the 40-hour week was posted as "directly a result"[8] (emphasis supplied) of the meeing of June 6. It is obvious that the reasonable interpretation of this phrase is that the *"proposition"* came as a direct result of the meeting. Assuming that one construction of Harder's testimony is that the proposition for the 40-hour week was made *at* the meeting and that it was not made there, nevertheless we do not regard it as substantial evidence warranting the inference that the proposition was *not* submitted *subsequent* to the meeting and prior to the posting of the notice. To make it the basis of a finding of a fraudulent lie, damning the integrity of the respondent, is unwarranted as a support for a general cease and desist order or the disestablishment of the Association.

██ Even if Harder's statement be deemed intended to give undue credit to the committee, we do not regard it, *taken alone* (our analysis shows nothing else), as establishing such action as warrants a cease and desist order. Such an order takes from the *de novo* consideration of the Board and makes a matter of court contempt the employer's future relations with the absent and unrepresented Association. Cf. National Labor Relations Board v. Pacific Greyhound Lines, 9 Cir., 106 F.2d 867, 871. When under the pressure of possible contempt proceedings under a general cease and desist order the employer will be likely to refuse any discussion with his employees or any concession for fear of being dragged before this court on just such charges as are made here.[9] While the respondent's brief states that it is "perhaps arguable" that such an order may be made here, since such an order, if unjustifiably made, affects the employee as much as the employer, we resolve the argument in favor of the unhampered and friendly relations between it and its employees, in the Association or out of it, in their mutual cooperation for the production of electric motors. Cf. International Brotherhood of Teamsters, etc. v. International Union of United Brewery, etc., Workers of America, 9 Cir., 106 F.2d 871, 875.

til after the third meeting.

"Q. When did you *meet with the management?* A. Well, let's see. That has only been—I would say it was along the latter part of September.

"Q. Who was present *at that meeting?* A. Mr. Harder, Mr. Mendenhall, Mr. Heinze, Mr. Manes, Mr. Warner and myself.

"Q. What was discussed? A. The first thing that was brought up was the apprentice question."

[8] Superintendent Harder's testimony is:

"Q. This Respondent's Exhibit 6, Notice to all employees *on hourly and piecework basis,* dated June 14, 1937, signed 'W. C. Harder, Superintendent,' was that posted by you? A. Yes, sir, that was posted on the clock by me personally.

"Q. Was that after the Employees Committee had met with the management? A. Yes, that was after their first meeting with the management.

"Q. Was that posted as a result of that meeting—growing out of that meeting? A. That was directly a result of the meeting, yes." (Emphasis supplied).

[9] And in the eight cases from six other circuits cited in footnote 6, supra.

Our careful and meticulous analysis of the testimony relied upon in the Board's brief and argument is for the purpose of showing the helplessness of these mechanics against the attempted destruction of their Association without counsel in the proceeding, even assuming they had the right to cross-examine and to introduce evidence.

■ Under Section 7 of the Act, it is as much the duty of the Board as an administrative body to protect the self-organization of employees where it is properly exercised, as it is to destroy a union where it has submitted to domination. Cf. Lau Hu Yuen v. United States, 9 Cir., 85 F.2d 327, 331. *A fortiori* is such protection required where, as here, the Board has not given the Association the opportunity to protect itself.

Such protection could be given only by a frank questioning of the three members of the Association's Committee on the subject of the concealed claim as, "Did you write or telephone or one of you personally or through a straw boss *submit* to the management a proposition of a 40-hour week and time and a half for overtime?" Had the Association been a party and represented by counsel, and if he had guessed the Board was seeking to establish fraud, he may well have asked such direct questions about such a submission in the eight intervening days and in argument laid a proper emphasis on the Board's burden of proof.

Yet, without disclosure to anyone of a contention of fraud and without such frank questioning, the Association for six months has been frustrated by the Board's disestablishment order. Quite likely, despite Section 7 of the Act, all that the employees gained by their self-organization has been dissipated. The order's tendency would be to cause the 75 percent majority to disappear and the employees to drift into some one of the larger outside unions, which they did not prefer.

■ Even if such fraud of the employer had been proved, coming as it did *after* the Association's free and unaided organization, it would not be a ground for disestablishment. To hold otherwise would place it in the power of any employer to disestablish a union to which it was opposed by means of such a pretense. The acceptance of such an unsolicited benefit is not evidence of the Association's subservience.

The Association subsequently adopted its by-laws and elected officers but no other act of the management is claimed by the Board as an attempt to dominate it.

The Board does not contend that respondent violated Section 8(5) of the Act by refusing to bargain collectively with any other labor organization. It further contends in support of the disestablishment of the absent Association that respondent had shown an attitude of hostility to another labor organization seeking membership of its employees which, contrasted with its later cooperative attitude towards the Association, evidenced respondent's attempt to influence its employees' choice of their representative. It is claimed this hostility is shown by Mr. Mendenhall's failure in the month of May to answer repeated telephone calls of a Mr. Kelly, international representative of the International Brotherhood of Electrical Workers, and Mr. Fllicott, business manager of Local 83, affiliated with the Brotherhood.

These men were trying to organize all respondent's employees in a "unit" of a Local of the Brotherhood. They claim they were trying only to explain to Mr. Mendenhall the nature of the organization which they were attempting to persuade the employees to join. Mr. Kelly testified: "My efforts, in the beginning of any organization, is to contact the management and attempt to explain to the management the aims and ideas of our organization, and those calls on the Mondays, prior to the last week in May, were made in an effort to establish *friendly relations* with the management." (Emphasis supplied). In a subsequent letter Mr. Ellicott wrote the respondent that the purpose of these telephone calls was: "For the past several weeks, International Representative Kelly and the undersigned have attempted to arrange an appointment with you for the discussion of Industry affairs, but have been unable to make such arrangements."

The telephone calls were received by a telephone operator and a stenographer. Though there is no testimony to that effect we may assume that the persons making the calls explained to the operator and stenographer that they desired to discuss with Mr. Mendenhall the character of their union and intent to organize his employees.

■ Assuming, without evidence, that this was repeated to Mr. Mendenhall, we

can see no violation of the Act in failing to make an appointment with the organizers. In the telephone calls they did not claim, as they did in a later conference, to be seeking recognition as the chosen representatives of the men, as they, in fact, are not shown to be by the record. Nor did they represent that there were any grievances of which they sought correction. In this situation, since the Brotherhood was merely seeking to organize the men into its unit, Mendenhall's approval or his offer to assist would have been deemed evidence favoring the Brotherhood in violation of the Act. Any statement of opposition also would have been deemed evidence of a violation. We cannot deem this failure to respond to the telephone calls as evidence tending to support a destruction of the Association.

We doubt whether in any event a failure to make an appointment in response to telephone calls of a labor organizer or anyone else, where there is no sudden emergency, is a violation of the Act. In industry and in every-day life, if the telephone fails to procure an appointment on a matter of importance, one writes a letter stating the writer's business and, if not known to the addressee, his authority to act or proposed action in the desired meeting.

When Business Manager Ellicott actually became the representative of several ex-employees of respondent and wrote a letter to Mr. Mendenhall asking him for an interview concerning them as well as for a "discussion of Industry affairs," the interview occurred on the following day. On the day the letter was delivered and prior to the interview Ellicott filed charges that two of respondent's employees had been discharged for union activities. These charges were later dismissed by the Board.

In the interview Mr. Mendenhall protested against the claim of violation of the Act in the discharge of the men. On discovering that it was an "A. F. of L." and not a "C. I. O." union that had so assailed him without waiting for the interview requested in the letter he stated, "Well we will consider you the lesser of two evils." The effect of such a charge of injustice to his employees against an industrial manager would impair him seriously in his relations with his men, might lead to his discharge by his present employer and prevent future employment. At that time there was no other charge

filed of any violation of the Act. We can find nothing in the irritated remark of this unjustly accused man to support the destruction of the Association.

The testimony is uncontradicted that the Company had not been in good financial condition and that it had not felt able to meet all the demands of its employees for increased wages and shortening of hours. This condition had improved and was the reason given for the granting of the 40-hour week in the following June. It had from time to time in the preceding six months granted some of the demands of its employees. In the latter part of May, 1937, during the period in which the Brotherhood was attempting to organize the union, it granted a pay raise to several men in its winding department. The raise came by direct negotiation between the affected employees and the employer. The Board singles out from all the pay raises of the preceding six months this improvement of the employees' condition by the respondent as evidence that it was endeavoring to frustrate the formation of the unit sought by the Brotherhood.

We are unable to see how the selection of this particular one of a succession of concessions to the employees, some long antedating the Brotherhood agitation, is evidence warranting the disestablishment of the Association. It is true that in National Labor Relations Board v. American Potash & Chemical Corp., 9 Cir., 98 F.2d 488, 494, we held that a concession to a union, shown to be dominated by the employer, after fruitless attempts for over a year to obtain such concessions, warranted the inference that it was due to the employer's desire to "head off" the formation of a rival union of the American Federation of Labor. No such showing is made here. If the inference of an attempt to violate the Act were permitted under the circumstances of this case, all employers would be *in terrorem* in granting any improvement in their employees' conditions during the long period in which attempts, often by rival unions, were being made to organize them. We do not believe that Congress intended such a construction of an act to benefit the conditions of laboring men.

We have above considered individually the contentions of the Board's brief and argument. Reviewing them as a whole we are unable to see that they support a finding of dominance of the Asso-

ciation or an interference with its affairs. In the language of National Labor Relations Board v. Columbian, etc., Co., supra, 306 U.S. page 300, 59 S.Ct. page 505, 83 L.Ed. 660, the evidence is not "enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." Hence we order set aside the Board's cease and desist orders with respect to respondent's (a) dominating or interfering with the Association; (b) recognizing the Association as bargaining agent of its employees. Also, since there is no such substantial evidence of any unfair labor practice of the respondent, we set aside the general cease and desist order with reference to other unfair labor practices.

 It is suggested that since it is shown that "the unfair labor practice does not justify disestablishment, * * * it [is] unnecessary to consider the effect of the failure formally to make the Association a party." This is not a case determining a contention that a congressional statute violates the Constitution. It is merely construing administrative conduct with reference to "the cherished judicial tradition embodying the basic concepts of fair play" as in the case of Morgan v. United States, supra.

 The fact that the statute has given this powerful Board grave responsibilities in protecting the rights of employees and has had to meet great difficulties in creating its nationwide establishment, does not make it, before this court, any more than *just another litigant* on the issue of the denial of a civil liberty of these mechanics and their small Association. Hence we do not believe this intermediate appellate court should abandon its practice and that of the Supreme Court[10] of basing its decisions on more than one ground where the record shows there are two existing in favor of the litigant who prevails on the appeal. Here we regard the violation of the Association's right to notice and opportunity to be heard as the paramount of the violations of its rights.

The wrong to the absent union which may result in this case from such a departure from the practice of this intermediate appellate court is obvious. The Board may persuade the Supreme Court that our holding the inside union had acquired the status of a labor organization prior to June 6 is erroneous and, absent consideration of the alternative ground of our decision, that enforcement of the Board's order should be directed. This would result, though if the union had been a party it might well have shown that the statement was true that its committee by letter, telephone or verbally by a single representative actually submitted the request for the 40-hour week.

Likewise the Board may persuade the Supreme Court that the facts concerning the failure to grant the telephone requests for an interview warrant an inference that the failure was an act adverse to the Brotherhood and in aid of the employees' self-organization. Cross-examination by counsel for the Association well might have shown that the real purpose of the telephone calls was for an opportunity to coerce the employer into favoring the Brotherhood and opposing the Association.

We have no justification, based on an assumption of our infallibility with respect to the value of evidence, for ignoring the question of law in denying the employees' union the right to notice and opportunity to be heard arising from the unquestioned fact of the absence of such notice and opportunity.

Order set aside.

HEALY, Circuit Judge (concurring in part and dissenting in part).

I think the evidence is insufficient to support the order directing withdrawal of recognition, and am satisfied that the disestablishment of the Association would have no tendency to effectuate the policy of the act. Accordingly I agree that the Board's order in these respects should be set aside.

It is clear that the Association grew out of a spontaneous movement for collective bargaining, participated in by a majority of respondent's employees, and culminating in the petition for recognition and the designation of the committee. At the time the petition was favorably acted upon by the management at their meeting with the

---

[10] Vide, United States v. Title Ins. & Trust Co., 265 U.S. 472, 485, 486, 44 S.Ct. 621, 68 L.Ed. 1110; Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340, 48 S.Ct. 194, 72 L.Ed. 303; Union Pacific Co. v. Mason City Co., 199 U.S. 160, 166, 26 S.Ct. 19, 50 L.Ed. 134; Davis v. Davis, 305 U.S. 32, 40, 41, 59 S.Ct. 3, 83 L.Ed. 26, 118 A.L. R. 1518.

committee on June 6, the Association had, for all practical purposes, acquired the status of a labor organization as defined in the act.[1]

There was no employer domination of its formation. Cf. National Labor Relations Board v. Newport News Shipbuilding & Drydock Co., 60 S.Ct. 203, 84 L.Ed. ——, December 4, 1939. What occurred afterward is another matter; but I think the subsequent interference with the employee union was neither vital enough nor sufficiently long-continued to warrant a measure so extreme as disestablishment.[2] I think, however, that the later interference justified the cease and desist order issued by the Board.

On June 14, eight days after the first meeting between the management and the committee, respondent posted the notice quoted in the main opinion, stating that the committee had submitted a proposition—acceded to by respondent—for a 40-hour week and time and a half for overtime. Both the trial examiner and the Board found that the statement was a fabrication. The majority opinion rejects the finding, and appears to hold further that even if the posted statement was deliberately false it did not constitute an unfair labor practice.

The respondent itself does not seriously question the finding. It contends only that the unfair practice was not of such character as to justify disestablishment of the Association.[3] Moreover, respondent does not claim surprise and made no request for leave to adduce further evidence on the point; nor has it intimated that proof was available of an actual proposal by the committee—proof which the Board's malevolence left undisclosed. In these circumstances, the majority's labored refinements of the testimony seem less calculated to uncover the truth than to establish a thesis.

I regard as irrelevant the discussion concerning the quantum of proof required to establish fraud. A proceeding under the National Labor Relations law is not a fraud action, and the mere application of epithets to conduct charged against an employer does not serve to make it such. The proceeding is purely statutory and the act lays down its own rules. It provides that "if upon all the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in" an unfair labor practice, it shall state its findings and shall issue an order requiring such person to cease and desist from the practice. 29 U.S.C.A. § 160(c). The Board's findings, if supported by substantial evidence, are conclusive.

The declared purpose of the legislation is to protect workers from unfair practices on the part of their employers; and I can conceive of no more effective method of nullifying this purpose than the erection of artificial standards of proof such as those set up in the main opinion. I venture to suggest that judicial interpolations of this sort tend in no way to safeguard the civil liberties of the laboring population.

The Board's complaint charged respondent with domination and interference with the administration of the Association, and in general terms with lending it improper support. It is quite probable that the Board did not know, in advance of the trial, the precise form the proof might take. Where surprise is claimed because of lack of precision in the allegations it is doubtless the practice of the trial examiner and of the Board to reopen the inquiry for the taking of further evidence. This court, too, has been liberal, and should continue to be liberal, in sending cases back to the Board where any party affected by the order, whether it be the employer or a labor organization, claims prejudice because of lack of specific pleading or otherwise. But

---

[1] § 2 (5), 29 U.S.C.A. § 152 (5): "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

[2] This appears to have been the view of the trial examiner, who recommended

a cease and desist order but no order of disestablishment.

[3] Respondent's brief (pp. 10, 11) states: " * * * it is perhaps arguable that it [the notice] constituted an indirect interference by management with the administration of the Association, continuance of which interference may be prevented by proper order to cease and desist. But it cannot constitute justification for an order of the Board dissolving the properly constituted bargaining representative of the employees."

all that aside, no prejudice in respect of this matter arose either out of the form of the charges or of the manner of conducting the inquiry.

Turning to the Board's finding, there is no hint in the testimony that the committee had made a proposition of the sort mentioned in the notice, or that they had made any other proposal except to request recognition. The three members of the committee, together with Johnson, respondent's president, testified that the committee's only demand was for recognition. The ensuing activities of the committee were related in detail and there is no discernible gap in the evidence bearing on the point. Indeed, the record as a whole produces conviction amounting to a certainty that there was no further bargaining prior to the date of the posting of the notice.[4]

Plant Superintendent Harder testified that the notice was posted after the committee's first meeting with the management, and that it was a direct result of that meeting. Had the action of the management been an outgrowth, in whole or in part, of any other conference, or of any demand from the committee or any of its members, it is only rational to believe that Harder would have said so. There were earlier stirrings of discontent among the employees which readily account for the concession,[5] but to attribute it to the demands of the newly formed committee is a totally different matter. It is clear that, in crediting to the efforts of the committee the shorter work week and extra pay for overtime, the management stepped beyond the bounds of propriety and truth.

The misleading nature of the notice, together with its laudatory language, evidence an attitude deliberately calculated to persuade the employees to shun other unions and to adhere to the Association. To those employees who had not joined the Association, and to those of its membership who might have been inclined to affiliate with the competing union, the implication was plain enough that their best interests in the future lay in the direction of the company union. Men whose subsistence depends on the continued holding of their jobs take notice of suggestions far less peremptory.

Under the law it was the duty of respondent to be neutral and to refrain from conduct or expressions tending in any way to influence its employees in the choice of a bargaining representative. I dissent from the court's putting its seal of approval on these dissembling practices.

Being of the opinion that the unfair practice does not justify disestablishment, I believe it unnecessary to consider the effect of the failure formally to make the Association a party. The cease and desist order is calculated to protect the employees, not to overthrow their Association; hence the presence of the latter is in no view a prerequisite to its enforcement.

---

[4] See particularly Bueter's testimony as quoted in the main opinion. Bueter was the chief actor in the employee group. He was interrogated and testified concerning the activities of the committee subsequent to the meeting. These he said had to do with plans for completing the organization, the first meeting of which was held on June 25. He states specifically that the matter of working conditions was not taken up with the management until the latter part of September. His testimony is corroborated by Mendenhall, respondent's manager, who testified that no further meeting was held with any committee of the Association until September 13, 1937.

[5] This is the only basis on which respondent attempts to explain the misleading statement.