**NATIONAL LABOR RELATIONS BOARD
v. STERLING ELECTRIC MOTORS,
Inc.**

No. 9209.

Circuit Court of Appeals, Ninth Circuit.

May 7, 1940.

HEALY, Circuit Judge, dissenting.

———◇———

For former opinion, see 109 F.2d ·194.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp, Asst. Gen. Counsel, National Labor Relations Board, all of Washington, D. C., for petitioner.

Hardy & Horwin, Leonard Horwin, and Jack W. Hardy, all of Los Angeles, Cal., for respondent.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

Our opinion in the first hearing of this review appears in 109 F.2d 194. The National Labor Relations Board has petitioned for and we have granted it a re-hearing of the entire proceeding. The contentions argued covered a much wider area than those of the briefs. This opinion concerns the issue of the right of Sterling Electric Motors, Inc., Employees Association, a self-organized inside or company union, to be made a party or to have notice and an opportunity to be heard before it can be destroyed by the Board's order of non-recognition and dis-establishment. We discuss and attempt to appraise the congressional intent in this labor legislation, with a consideration, "material to the philosophy of that Act," [1] of the effect of the "abuse" of administrative "power",[1] under the Board's renewed contention that Congress conferred on it this kind of administrative absolutism.

As stated in our first opinion, it was for the "protecting" of the laborers' human right to regulate their creative effort in American society, with their increased power in union organization, that Congress created the Board. Its "protecting" extends as much to the self-organized unions, provided for in Section 1 of the Act,[2] as to the powerful unions already existing and seeking to increase their membership.

In this case the destruction was attempted by an order forbidding the employer to bargain with its employees' union for higher wages, shorter hours or better working conditions—the destroyed functions being the only ones for which the employees created it. The men's association was not made a party or given notice and an opportunity to be heard in the proceeding.

One of the contentions of the Board is that the union, organized solely to bargain collectively with the employer, is not destroyed because the order does not "run against" the union but *only orders the employer not to have anything to do with it.* To us this contention is as absurd as if old Procrustes of the Greek myth had said to an athlete captured on his journey to the Olympiad, "You are not to be destroyed for the races for I am proceeding to cut off only the one leg which happens to protrude over the footboard of my bed. If you are barred at the starting line it is only because you are *indirectly* affected. My sword 'runs against' your leg not against you. Besides, I maintain, Lycurgus has given an opinion stating that you are not a 'necessary party' to the amputating process I administer. Can't you see I am only 'protecting' you from running with that leg?" Yet, the Board insists, such was the congressional intent with respect to its and necessarily, all the many other administrative processes created by Congress.

As well could it be argued by another board, created for "protecting" religious instead of labor organizations, (successfully argued, perhaps, in cases in which the board meets no opposing counsel) that an order does not necessarily affect the religious freedom of the worshippers, though it "runs against" one Bishop to "withdraw all recognition from" the parishes of his diocese, or against other Bishops to "disestablish" their missionaries, or against the Convention to ignore its baptising clergy, or against the Rabbi to disband his congregation, or against the Synod to refuse to consider anything from the Presbyters, or against the Indian priests to withdraw their clans from their ceremonial dances in prayer for rain in the desert. We are not in accord with the view that, where the denial of any such constitutional right appears in any case, it is then "ill advised" to afford the injured persons the court's judicial power, or to describe

---

[1] " * * * * it is not improper in a Sherman Act case to discuss corporate *power*, its use and *abuse*, so long as those statements are relevant to the issues at hand. For that subject is material to the philosophy of that Act." United States v. Socony-Vacuum Oil Co., 60 S. Ct. 811, 851, 84 L.Ed. ——.

[2] July 5, 1935, c. 372, 49 Stats. 449, 29 U.S.C.A. § 151. "It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and *by protecting the exercise by workers of full freedom of* association, *self-organization*, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection."

See infra for discussion of the Supreme Court's holding that this "protecting" is what the Act is created to provide.

with emphasis the wrong done,[3] whether the "protecting" assault be on a mundane or a religious liberty.

■ The reargument offered nothing new on the Board's contention that Congress intended to relieve the Board of the burden (sic) of serving notice of the charges and time of hearing on the officials of the union *in the same plant* as that of the employer, who must be served, with the corollary implication of the vexation to the Board, as prosecutor, in meeting the union's evidence, the cross-examination of the Board's witnesses and the argument of the union's counsel, and of the disturbance to the Board, as judge, in facility in reaching a decision on its own charges.

■■ The Board did not, because it cannot, deny that the employer's interest at the time of the trial often may be quite different from and opposed to that of the absent union. The employer himself then may want to destroy the union, either because he cannot control it, or because a more powerful rival threatens a strike and a picket line. He then may "ride to a fall" at the hearing, preferring to submit to an order to desist from something already prohibited by the statute, to the pressure of a disliked union he does not control, or to a costly shutdown which may throw him into bankruptcy. The likelihood of such motivation of the employer whose trial the Board claims determines the life of the union is obvious not only to those of us who have had intimate contact with industrial disputes of the recent decades, but to anyone who gives the consideration required here of employer psychology. We cannot believe that Congress ignored it, or rather, would have ignored it if, when the Labor Board bill was under discussion, some Congressman then had had the temerity to propose that the Board should destroy a union without notice and an opportunity to be heard.

■ Nor has the Board made any answer to the obvious fact that it is a greater evil wrongfully to destroy the union itself than it is to destroy a mere contract made by the union with the employer, leaving the union still existing for future bargaining. If it be true as held in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 233, 59 S.Ct. 206, 83 L.Ed. 126, that due process requires notice and hearing when a contract between the union and employer is sought to be destroyed, *a fortiori* is it true where the life of the union or its sole function of collective bargaining is at stake.

The case loses none of its importance because, recently, the Board, for the time being at least, divested itself of the power it claims Congress gave it to deny to a union its civil liberty of notice and an opportunity to be heard. This was done by the Board's promulgation of a rule granting that right. The right now exists, the Board claims, solely by virtue of its grant. The Board makes strong and now repeated insistence, first, that Congress can create in the administrative process such absolutism of control over human relations, and, second, that it intended to create it in the Labor Board. It is apparent that the Board may annul its rule, attempt to abrogate the right and reassume the absolute power it claims. Significant is the absence at the hearing of any request by the Board for a return of this proceeding for service on the employees' association, to give it an opportunity to be heard on the charge of employer dominance.

Preliminarily it may be said that this court recognizes that no case subject to our review could show more clearly the need for a wise and deliberative exercise of the national administrative process which Congress has created for the control of labor relations in industrial plants throughout the United States. This proceeding was initiated by a nation-wide union of the American Federation of Labor. It was seeking to bring into its organization the 70-odd employees of a small manufacturing plant in Los Angeles, California. A rival union, organized by the men within the plant, had a membership of 75 percent of the employees. The great Brotherhood's national organizers filed a complaint which led to the Board proceeding in which the destroying order removed its rival. None of the national organizers was an employee of the plant. One of them had his headquarters in Chicago. The central control of the national union was in Washington, with a power and prestige in the American industrial world

---

3 Vide the unanimous concurrence in Justice Black's opinion in Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 477, 84 L.Ed. ——, et seq.

which, in large part, arises from its millions of associated employee-members in unions in every state. It was such cases as this which must have quickened the congression intent to enact Section 1 of the National Labor Relations Act.[4]

In one of the earliest decisions after National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, this court in Edwards v. United States, 9 Cir., 91 F.2d 767, 780, construed that decision as extending the congressional power even to the planting in California of orange trees whose product is "to be transported" in interstate commerce. It was on this construction of the Act that we upheld the Secretary of Agriculture regulating the flow of the product of orange trees into interstate commerce. True, that statement of the law was by two of the three judges sitting, but it now stands for this circuit as a declaration of the broad area of congressional administrative power under the commerce clause. In that and a succession of cases, this court has recognized the congressional intent in a widely expanding creation of administrative agencies. Nor has any court gone farther in recognizing the congressional intent to free the Labor Board's administrative process from the technicalities of court procedure. National Labor Relations Board v. Biles-Coleman Lumber Co. 9 Cir., 98 F.2d 16, 17.

The many cases now decided show that, under penalizing restraints or offer of reward, the fruit grower now must consider a Washington bureau's decision before he may safely add orange or walnut trees to the few acres of his orchard and a small farmer must do the same before he determines his plowing for next season's crop. The shutdown of the single lumber plant supporting a mill town, by the heavy penalties we impose for infractions of the Labor Relations Act, well may mean the disruption of the family life of the employees, whose children must shift to the schools of a distant plant's neighborhood, the foreclosures of homes with the loss of part payments and, worse than this, the mental agony of parents and children that the supporting father may be marked with the stigma of the jobless and indigent.

These disturbing and often tragic results may be deemed to have been considered by Congress as necessary for the ultimate good of the creative life of Americans. However, because that good is to be obtained by powerful bureaus radiating out, through a major and minor officialdom from a distant Washington, the danger to our democracy is always present of the denial of those civil liberties upon which its existence depends. If the Anglo-American civil right to be made a party and to have notice and hearing must be observed in the orderly procedure of a court of law before a decision, as here, can destroy, *immediately and directly,* a citizen's property or his liberty to contract to form a labor association and bargain collectively with the employer, *a fortiori* must it be recognized in the looser proceedings we have recognized before subordinate and superior bureau officers, whose administrative decisions are finally made far from the homes of the regulated persons.

It has been said that the Board is accuser, prosecutor, judge and executioner. This is obvious as to the first three functions. In our democracy their exercise requires the greatest of wisdom and detachment when, as here, the accuser and prosecutor sits as judge. The orders it made in this case are not final against the employer, who is a party in the Board proceeding and has the right to appear here and defend against a petition for our decree of enforcement. With regard to the destruction of the absent union the situation is entirely different.

Here, so far as concerns that destruction, the Board, at the instigation of a rival, accuses the union of employer dominance, the Board's attorneys prosecute the accusation, the Board hears and determines the truth of the charge, and the Board orders the execution of the union by its disestablishment. The Board's orders against the employer, a party, may be regarded as preliminary rules to be made absolute by our decree after a hearing of the employer's defense. So far as concerns any defense which could have been made by the ab-

---

[4] Cf. analysis of right of employees under National Labor Relations Act to join a national union, self-organize an in-side union or remain unorganized, in our first opinion. 109 F.2d 194, 201, 202.

sent executed union, denied its civil liberty of due process, without opportunity to produce witnesses, cross-examine, or to be heard in argument, our decree, the Board claims, *must* make the preliminary rule absolute.

This is the kind of administrative absolutism denounced in democratic assemblies in America as characteristic of the totalitarianism of the Central European powers. In the consideration of congressional intent, the polemics of deeply moved public men, whose apprehensions are now realized in the conquest of two of the Scandinavian democracies, are not to be ignored. We do not belive that Congress in the National Labor Relations Act intended to make a long start on the road where our civil liberties are to be regarded as the "pale phantoms of objective law" which no longer control our deliberations, as the German chief justice on the first session of the newly constituted court in conquered Poland is reported to have told his colleagues.

It is our opinion that, when the Labor Board bill was under consideration, if any Congressman had stated that such absolute power was intended to be conferred on the Board, it would have been denied promptly by the bill's advocates. If its statement had been pressed persistently as expressing the proper congressional intent, we would have expected that its author would have been "shouted into silence".

In making these comments we are not oblivious of the heavy burden thrown on the Labor Board in creating a nationwide organization in a period of devastating labor disturbance nor have we failed to take account of the vast number of labor disputes it successfully has solved both by conference and formal procedure. That a federal board so burdened should grasp for power as it does in this case is to be expected. To curtail this inevitable overreaching is one of the first necessities of a democratic government and is one of the most important duties of our courts.

The Board cites the same cases of the Supreme Court and circuit courts of appeals on which it relied on the first hearing. In none was there counsel presenting the violation of the civil liberties of the employees and their union. Particularly was there none in National Labor Relations Board v. Pennsylvania Grey-hound, 303 U.S. 261, 58 S.Ct. 571, 82 L. Ed. 831, 115 A.L.R. 307, where the Board, free of anyone affected to present the question of civil liberty there involved, was able to destroy the absent union.

The Board correctly claims that its advocacy in other cases has succeeded in destroying other absent unions. It also claims it has established the denial of such civil liberty as a part of our administrative law.

■ In our first opinion we decided that these cases have been overruled by or are not in accord with Morgan v. United States, 304 U.S. 1, 22, 21, 58 S.Ct. 773, 778, 999, 82 L.Ed. 1129, in which administrative proceedings are commanded to observe "the cherished judicial tradition embodying the basic concepts of fair play" and in them men are to have their day in court and to be given the "essentials of a full and fair hearing, with the right * * * to have a reasonable opportunity to know the claims advanced against them * * *." Cf. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 47, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352. Our decision in this regard is confirmed by a recent opinion of Mr. Justice Frankfurter in which all the Justices concurred, except Mr. Justice McReynolds, who concurred in the result. In that case, in reviewing the area and content of the expanding administrative law, the court, through Justice Frankfurter, stated: " * * To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play. They require that interested parties be afforded an opportunity for hearing and that judgment must express a reasoned conclusion. * * *" Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 442, 84 L.Ed. ——.

The Board cites as determining the congressional intent to create the absolute power claimed here, the case of National Licorice Co. v. National Labor Rel. Board, 60 S.Ct. 569, 84 L.Ed. ——. The report of that case shows no counsel representing the employees or the union. As we read the opinion the petition for certiorari raised no question of the disestablishment of the union. The case involves the individual contracts of employees with the employer which *on their face* showed agreements in violation of the Act. The decision that the employer should not

perform such obvious violations, involves no denial of civil liberty or of the doctrine of fair play established (or rather recognized as fundamental law) in the Morgan and Pottsville cases. The National Licorice case does not mention either of these two decisions.

The National Licorice opinion (60 S. Ct. at page 576, 84 L.Ed. ——) holds, in the language of section 1 of the Act the function of the board to be that of "protecting the exercise by workers of full freedom of association, *self-organization,* and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." (emphasis supplied). Our attention has not been directed to any statute in which Congress has declared its intent to afford such "protecting" which consciously has been held to afford it by condemning the protected party *in absentia* and ordering its execution. Hence, we cannot believe that the Supreme Court in the Licorice opinion, holds that Congress, while intending such "protecting" made it mere mockery by conferring on the board the power to destroy by disestablishment a union, so self-organized, or to frustrate it in the performance of the very functions which the Act requires the Board to protect, without making it a party or giving it an opportunity to be heard.

Before we deem ourselves required to recognize that Congress intended such a denial of civil liberty the Congress or the Supreme Court, we trust, in a case in which the union, absent at the board hearing, is there represented by counsel, will have to declare it in language so plain that no other possible inference may be drawn from it. We adhere to our detailed reasoning and holding expressed in our first opinion, pages 196 to 200, 109 F.2d.

On the suggestion of the Board that further evidence might be taken on the issue of alleged fraud of the respondent in statements in its notice to its employees, considered in 109 F.2d on pages 204 to 208 of our original opinion, the respondent applied for an order, which we have granted, for a reference on that issue. The Board has advised us that many of the employee-witnesses are widely scattered since the hearing in October 1937, and that it will take a substantial time to prepare to meet the respondent's proffered testimony outlined in its application. The evidence offered in all likelihood will have to be passed upon by the trial examiner and later in Washington by the Board itself, and several weeks more may transpire before the issue is decided and returned to this court. That the Board does not regard the case as likely to be "moot" is apparent from its statement at one of the several sessions. There, in response to an inquiry as to the time to be consumed in the referred proceeding, the Board stated that "the respondent will want to except to the decision" on the issue not yet heard and on which it had not yet gathered its evidence.

Since our decision of this issue of disestablishment and frustration disposes of the Board's orders as affecting the Association, and since the Board insists on asserting its power to destroy the union without granting it or its members the civil liberty here discussed and has not suggested even now that it will re-open the case as a whole and serve notice on the Association, as its present rule requires, we decide it now. We leave to our later consideration the orders solely affecting the employer. Further to delay with regard to this small self-organized union *might amount to an unfair labor practice on the part of this court,* for in that period the pressure of the Board's order and of its powerful rival well may persuade the men to give up their self-organization as hopeless, and the protection of Section 1 of the Act a vain delusion.

The Board's petition for enforcement of its order that the respondent employer shall not bargain collectively with the Association and that respondent shall disestablish that union is denied. Decision on the petition for enforcement of other orders of the Board is reserved.

HEALY, Circuit Judge (dissenting).

On the reargument in this case respondent Sterling Motors applied to the court for leave to adduce additional evidence, in conformity with § 10 (e) of the act, 29 U.S.C.A. § 160(e). Leave was granted and the matter is again before the Board for the taking of further testimony. The point of fact to be inquired into is the crucial one on which the Board largely predicated its finding of an unfair labor practice and its order

disestablishing the employee union as a bargaining agency.

The *statute*, § 10 (e), provides that the Board may "modify its findings as to the facts, or make new findings, by reason of additional evidence so taken and filed, and it shall file such modified or new findings, * * * and shall file its recommendations, if any, for the modification or setting aside of its original order."

In this posture of the case, with the question of law dealt with in the majority opinion threatening to become moot, I regard its decision at this, and for the second, time as not only unnecessary but as ill advised. That would be true, I think, even though the question were still open to rational debate. But debate, in inferior federal courts at least, has been foreclosed by National Licorice Company v. National Labor Rel. Board, 60 S.Ct. 569, 84 L.Ed. ——, decided March 4th of this year.

There the Supreme Court unanimously rejected the construction given the act by this court in its original opinion, 109 F.2d 194. In the present opinion, the majority merely reiterate what they said before. While studiously aimed at the Board, the real target of the present attack would seem to be the Labor Relations Law itself or the Supreme Court's interpretation of it.